STATE OF NORTH CAROLINA v. DWIGHT LAMONT ROBINSON

No. 586A87

(Filed 3 October 1991)

**1. Constitutional Law § 287 (NCI4th)— right to counsel—denial of motion to remove—no error**

The trial court did not err in a prosecution for murder, assault, and robbery by denying defendant's motion to remove his initial court-appointed attorneys where defendant alleged an inability to trust his counsel stemming from their decision to have him sent to Dorothea Dix Hospital for a pretrial forensic examination without his consent, resulting in a breakdown in communications. Defendant did not show ineffective assistance of counsel at trial or any impediment to the presentation of his defense caused by the forensic examination, and defendant was provided additional counsel with whom he was satisfied.

**Am Jur 2d, Criminal Law § 982.**

**2. Jury § 6.3 (NCI3d)— jury voir dire—questions concerning racial discrimination—restricted—no abuse of discretion**

The trial court did not abuse its discretion in a prosecution for murder, assault, and robbery by restricting defendant's voir dire questions concerning racial bias where the court al-

1

lowed defendant to question each juror as to whether racial prejudice would interfere with his or her ability to render a fair and impartial verdict, as well as other general questions. Given the latitude which the trial court allowed defense counsel, the minimally intrusive rule in *Turner v. Murray*, 476 U.S. 28, and the broad discretion afforded trial courts in this area, it cannot be said that the trial court abused its discretion.

**Am Jur 2d, Jury §§ 200, 202, 284.**

3. **Jury § 7.12 (NCI3d)— murder—voir dire—opposition to death penalty—challenges for cause**

The trial court did not err in a murder prosecution by allowing the State to challenge for cause two jurors where one would automatically vote for life imprisonment because of opposition to the death penalty and the other indicated that she had personal views against the death penalty which would interfere with her ability to fairly consider both punishments.

**Am Jur 2d, Jury § 289.**

4. **Jury § 7.14 (NCI3d)— voir dire—peremptory challenges—racial discrimination—no error**

The trial court did not err in a prosecution for murder, assault, and robbery by allowing the State to peremptorily challenge black jurors where the State met its burden of coming forward with neutral, nonracial explanations for each peremptory challenge, including, among other factors, failure to reveal past criminal histories as required by the jury questionnaire, not admitting being acquainted with the State's chief investigator and witness, and previous testimony by a juror for her husband in a manslaughter case prosecuted by Guilford County prosecutors.

**Am Jur 2d, Jury § 235.**

**Use of peremptory challenge to exclude from jury person belonging to a class or race. 79 ALR3d 14.**

5. **Constitutional Law § 342 (NCI4th)— murder—conferences and discussions—absence of defendant—no prejudice**

There was no prejudice in a prosecution for murder, assault and robbery from the absence of defendant during conferences and discussions where all but six of the conferences complained

STATE v. ROBINSON

[330 N.C. 1 (1991)]

of by defendant were bench conferences at which all five counsel conferred with the judge while the conferences were recorded by the court reporter. The six proceedings which were not bench conferences involved the *Batson* issue during jury selection and the court reporter was present at all times and recorded and transcribed the complete proceedings. The subjects of the conferences and discussions were either points of law, procedural matters, or administrative matters, none involved communication with the jury, and no witness gave testimony concerning defendant's guilt.

**Am Jur 2d, Jury § 190; Trial § 226.**

6. **Criminal Law § 73.1 (NCI3d)— emptying of dumpster— hearsay—not plain error**

There was no plain error in a prosecution for murder, assault and robbery in the admission of testimony from detectives that the dumpster in which physical evidence had allegedly been placed had been emptied prior to being searched by officers where defendant did not object to the testimony at trial and, assuming that the evidence was improperly admitted, it was not the key piece of evidence which convinced the jury of defendant's guilt.

**Am Jur 2d, Evidence §§ 494, 1103.**

7. **Criminal Law § 60.5 (NCI3d)— fingerprints—explanation for absence—irrelevant—not prejudicial**

There was no prejudice in a prosecution for murder, assault, and robbery from the admission of testimony by a fingerprint expert to the effect that he had discovered identifiable fingerprints in only three percent of the criminal cases in which he had been involved. The presence or absence of fingerprints at other crime scenes investigated by the witness is not relevant to the presence or absence of fingerprint evidence in this case; *State v. Holden*, 321 N.C. 125, concerned testimony which merely offered a scientific explanation of why fingerprints are sometimes not left behind after an object has been touched. However, there was no prejudice because defendant was placed at the scene by three eyewitnesses and this testimony does not create a reasonable possibility that a different result would have been reached. N.C.G.S. § 8C-1, Rule 401; N.C.G.S. § 15A-1443(a).

STATE v. ROBINSON

[330 N.C. 1 (1991)]

Am Jur 2d, Expert and Opinion Evidence §§ 279, 281, 284.

8. Criminal Law § 45.1 (NCI3d) — cross-racial identification — expert testimony — experiment not admitted

The trial court did not abuse its discretion by finding that an expert on perception and eyewitness identification had not given an opinion specific enough to support admission of testimony regarding an experiment where the witness expressed an opinion on cross identification; testified to the results of experiments in which white and black assailants came into his classroom, attacked him, and left the room; and the State objected to a question which related the result of an experiment involving the accuracy of eyewitness identifications when the assailant was not present in the lineup. For whatever reason, the witness never gave a specific opinion concerning the accuracy of eyewitness identification when the actual perpetrator is not in the lineup.

Am Jur 2d, Expert and Opinion Evidence § 278.

9. Criminal Law § 88.1 (NCI3d) — cross-examination — psychiatric report — no plain error

There was no plain error in a prosecution for murder, assault, and robbery where the court failed to act *ex mero motu* to prevent the State's cross-examination of Dr. Sciara concerning the contents of a psychiatric report prepared by the forensic staff at Dorothea Dix. The jury heard testimony from defendant that he was in another town on the night of the murder, testimony from an alibi witness corroborating defendant's testimony, and testimony from three eyewitnesses who placed defendant at the scene of the crime. The jury believed the eyewitnesses, and it is not probable that the jury would have reached a different verdict absent the State's cross-examination of Dr. Sciara.

Am Jur 2d, Evidence §§ 440, 1162, 1178.

10. Criminal Law § 66.3 (NCI3d) — pretrial identifications — photographic and live lineups — in-court identification not tainted

The trial court's conclusions in a prosecution for murder, assault, and robbery that pretrial identification procedures were not tainted and that the in-court identifications were based solely on the witnesses' observation of defendant at the time

of the crimes were supported by the findings, and defendant concedes that the findings are generally consistent with the evidence. Defendant did not raise at trial the contention that some of the persons in the lineup did not match the description given by the witnesses and there was no plain error.

**Am Jur 2d, Evidence §§ 371, 371.8.**

**11. Homicide § 30 (NCI3d)— murder—failure to submit second degree—no error**

The trial court did not err in a murder prosecution by failing to submit the issue of second degree murder where the State's evidence showed that defendant robbed a restaurant at night, ordered the victims to lie down, methodically aimed at and shot them, and there was no credible evidence to the contrary.

**Am Jur 2d, Homicide § 530.**

**12. Criminal Law § 462 (NCI4th)— murder—prosecutor's arguments—no objection at trial—no denial of due process**

The arguments of the prosecutors at a trial for murder, assault, and robbery were not so grossly improper as to constitute a denial of defendant's due process rights.

**Am Jur 2d, Trial §§ 554, 705.**

**13. Criminal Law § 1352 (NCI4th)— murder—McKoy error—prejudicial**

There was *McKoy* error in the sentencing proceeding in a murder prosecution where the court instructed the jury that any mitigating circumstances had to be found unanimously; the court submitted the mental age of the defendant as a mitigating circumstance; there was sufficient evidence to allow a reasonable juror to find that defendant's mental age was below normal; and the jury did not find that circumstance. The jury did not necessarily consider defendant's mental condition when deciding the mitigating circumstance that defendant was under the influence of drugs or alcohol or suffering from a mental condition which impaired his capacity because it could have found that circumstance based on the overwhelming evidence of defendant's regular drug use. Although the State contended that the evidence of guilt and aggravating circumstances was overwhelming, it cannot be said beyond a

reasonable doubt that no reasonable juror could have found the evidence credible, given it mitigating value, and concluded that life imprisonment was the appropriate punishment.

**Am Jur 2d, Criminal Law § 600; Trial § 1113.**

**Unanimity as to punishment in criminal case where jury can recommend lesser penalty. 1 ALR3d 1461.**

Justice MITCHELL concurring in part and dissenting in part.

Justice MEYER joins in this concurring and dissenting opinion.

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a death sentence entered by *Ross, J.*, at the 17 August 1987 Criminal Session of Superior Court, GUILFORD County. Defendant's motion to bypass the Court of Appeals as to additional judgments was allowed by the Supreme Court on 27 November 1989. Heard in the Supreme Court 11 February 1991.

*Lacy H. Thornburg, Attorney General, by Ellen B. Scouten, Assistant Attorney General, for the State.*

*Sam J. Ervin, IV, for defendant.*

FRYE, Justice.

On 17 March 1986, defendant was indicted for the first-degree murder of Robert Page and robbery with a dangerous weapon. On 6 April 1987, defendant was also indicted for two counts of assault with a deadly weapon with intent to kill inflicting serious injury upon Gene Hill and Tammy Cotner. The offenses were joined for trial. On 17 September 1987, the jury returned verdicts of guilty of first-degree murder on the basis of malice, premeditation and deliberation, and under the felony murder rule. The jury also found defendant guilty of robbery with a dangerous weapon, and guilty on both counts of assault with a deadly weapon with intent to kill inflicting serious injury. Following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended and the court, on 22 September 1987, imposed the sentence of death in the first-degree murder case. Defendant was also sentenced to forty years for the robbery with a dangerous weapon conviction, and

twenty years each for the two convictions of assault with a deadly weapon with intent to kill inflicting serious injury.

In a voluminous two-volume, 357-page brief, defendant contends that the trial court committed numerous errors entitling him to a new trial or in the alternative a new sentencing proceeding. We find no prejudicial error in defendant's trial, but conclude that defendant is entitled to a new sentencing proceeding in the murder case under *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990).

The State's evidence presented at trial tended to show that Tammy Cotner and Gene Hill were employees of the Western Steer Steak House in High Point, North Carolina, where Robert Page was manager. On 2 March 1986, Cotner, Hill, and Page worked until the restaurant closed around 11:00 p.m. They were the last persons to leave the restaurant. After leaving the restaurant, Hill went to his car and started the engine, then went to talk to Cotner, who was standing next to her car which was parked at the back door of the restaurant. Page was locking the back door of the restaurant when two men approached him. One of the men walked over to Cotner and stuck a pistol to her side. Cotner identified this man in court as defendant.

Defendant escorted Cotner, Hill, and Page to the front door of the restaurant. Page was instructed to open the front door, and when everyone was inside the restaurant, they went to the fuse box where Page turned on the office lights. After the lights were turned on, everyone went to the back office where the safe was located. Defendant instructed Cotner to lie on the floor face up, and Hill was instructed to lie beside her on his stomach.

Defendant told Page to open the safe. Page attempted to open the safe, but was having difficulty, so defendant fired his pistol at Page twice, hitting him in the leg. When Page managed to get the safe open, defendant removed the money, then picked Page up by his shirt and dragged him to the back storage area. Defendant also forced Cotner and Hill to go to the back storage area and to lie on the floor.

The other man with defendant was armed with a shotgun, and told defendant, "Let's tie 'em up and put them in the freezer." Defendant responded, "Nah, man. We don't have time." Defendant then straddled Page, who was lying on his stomach, aimed his

gun at Page and shot him in the head. Next, defendant turned to Hill, aimed his gun at Hill's head, and shot him in the head. Finally, defendant straddled Cotner, shot her in the stomach and again in the back of her head. Both Hill and Cotner identified defendant in court as the man who shot them.

Defendant and his accomplice left the restaurant, got into Hill's car, and fled. They caught up with Thomas Wood, the man who had driven them to the Western Steer. Wood was attempting to drive away, but when defendant and his accomplice caught up with Wood they abandoned Hill's car and got into Wood's car. The three men drove to Maryland the following day. Five days later, Wood told his former employer, Guarad Crawford, about what had happened at the restaurant, and Crawford got in touch with the police. Officers in Maryland executed a search warrant for defendant's residence on 9 March 1986. Defendant was not found until 18 March 1986, and a SWAT team had to be used to remove defendant from his apartment where he had barricaded himself in a bedroom. Wood later testified in court that he had driven defendant and the accomplice to the Western Steer, but had not gone inside during the robbery.

Page died of a close-range gunshot wound to the head which went through his skull and destroyed his brain. Hill survived his injuries which consisted of a close-range bullet hole in the right side of the face and swelling of the tongue which blocked his air passages. Hill's face has marks of the powder burns, a bullet entry wound, and the bullet remained lodged in his head at the time of trial. Cotner suffered a bullet wound to her abdomen and another bullet passed below the base of her skull which penetrated her skin two inches in depth.

Defendant testified and denied ever going to the High Point Western Steer. Defendant also denied even knowing that someone had committed an armed robbery at the restaurant. According to defendant, on the night the robbery occurred, he was at a club in Thomasville, North Carolina, selling drugs. Defendant offered as an alibi witness the testimony of one of the club's patrons who testified that he had seen and purchased drugs from defendant at the club around the time that the crime was committed. Defendant also offered the testimony of the club's "bouncer" who testified that he saw defendant at the club between 8:30 p.m. and 9:00 p.m. on the night the crime was committed.

**STATE v. ROBINSON**

[330 N.C. 1 (1991)]

Defendant offered the testimony of Dr. Anthony Sciara, a psychologist who practices in Asheville, North Carolina. Dr. Sciara testified that he examined defendant and determined that defendant had a verbal I.Q. of 65, a performance I.Q. of 77, and a full scale I.Q. of 69. According to Dr. Sciara, defendant was functioning in a mentally retarded range of intellect with a full scale I.Q. that puts him "in the lowest two percent of the population." Dr. Sciara testified that defendant's "mental functioning is significantly below average. It would be my best estimate that he's functioning probably at around a fourth grade level. So, the level of his intellectual functioning is really significantly lower than what we would expect for an adult that was twenty-nine years old."

Defendant also offered the testimony of Dr. Spurgeon Cole, a psychologist at Clemson University, who presented expert testimony in the field of eyewitness identification. Dr. Cole testified that there are numerous factors which can influence the accuracy of eyewitness identification. For instance, Dr. Cole testified that "in situations where there is a weapon, for example, people tend to observe the weapon much more closely than they observe anything else." Dr. Cole also testified that "[c]ross racial identifications are more difficult to make and tend to decrease the accuracy in an eyewitness identification." The defendant is black; Cotner and Hill are white.

During the sentencing hearing, the State, in addition to relying upon the evidence admitted during the first stage of the trial, presented evidence that on 11 March 1983 defendant was convicted of robbery with a dangerous weapon in Maryland. The Maryland Court sentenced defendant to ten years in prison, with credit given for 291 days in pretrial confinement and the balance of the active sentence suspended subject to certain conditions.

Defendant offered evidence during the sentencing proceeding which tended to show that as a child his father had beaten him severely with extension cords, belts, and switches. Defendant's sister testified that their father would beat defendant for no reason when their father had been drinking. Defendant's sister also testified that at various times during defendant's adolescence, their parents would be unable to pay for the rent on the family's residence, and on such occasions, their parents would take their daughters with them, and they would leave defendant and his brother to

find their own place to stay. Dr. Sciara testified that defendant's school records indicated that he only completed the seventh grade.

Defendant offered additional evidence during his sentencing proceeding which tended to show that he is married and has two children. Defendant's sister testified that defendant was a good father and never exercised any violence toward his children. There was evidence that defendant's brother died a violent death which caused defendant to isolate himself from others. There was also evidence that defendant's father is a double amputee and has become mentally incompetent. Defendant's wife testified that defendant has a drug problem, and his drug addiction costs approximately $1,500 per week.

Additional evidence relevant to defendant's specific arguments will be discussed in this opinion as necessary for an understanding of the twenty-seven issues raised by defendant. We will address the issues raised in four categories: I. pretrial motions; II. jury selection; III. guilt-innocence phase; and IV. sentencing phase.

## I.

### PRETRIAL MOTIONS

[1] The first question we address is whether the trial court committed reversible error by denying defendant's request for the removal of his initial court-appointed counsel predicated upon irreconcilable differences between defendant and his attorneys on the grounds that the trial court's refusal constituted an abuse of discretion and deprived defendant of his right to effective assistance of counsel. We conclude that the trial court did not err.

Defendant was charged with first-degree murder and robbery with a dangerous weapon, and the grand jury returned bills of indictment on 17 March 1986. On 6 April 1987, the grand jury returned a bill of indictment against defendant for assault with a deadly weapon with intent to kill inflicting serious injury. Robert S. Boyan and James M. Green, Jr., were appointed to represent defendant. However, on 26 March 1987, Boyan and Green filed a motion for withdrawal by defense counsel, citing as the basis for this request "[t]hat at said time it [has become] readily apparent to counsel that defendant [does] not trust either or both of his appointed counsel; that defendant refused to cooperate in the preparation of his defense; and, that defendant was adamant that counsel not represent him at trial." On 31 March 1987, a hearing was

held before Judge DeRamus who denied Boyan's and Green's motion to withdraw. On 2 April 1987, Judge DeRamus entered an order appointing Avis Goodson as additional counsel for defendant.

Defendant contends that he did not trust his initial court-appointed attorneys and he therefore refused to cooperate with them. Defendant insists that his inability to trust Boyan and Green stemmed from their decision to have him sent to Dorothea Dix Hospital (Dorothea Dix) for a forensic examination without his consent. Defendant argues that he objected to his initial trial counsel having him sent to Dorothea Dix for a forensic evaluation because the procedure involved an interference with his personal autonomy, which is similar to an interference with a criminal defendant's basic right to determine his own plea, or whether to testify; therefore, his complaint was completely legitimate. Defendant cites *State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985), *cert. denied*, 476 U.S. 1123, 90 L. Ed. 2d 672 (1986), for this proposition. Defendant further contends that his attorneys violated his right to effective assistance of counsel. According to defendant, the resulting breakdown in communication was equally legitimate and constituted good cause for allowing Boyan and Green to withdraw; thus, the trial judge who refused to replace them under these circumstances abused his discretion.

The State contends that the tactical decision in the present case to obtain an order compelling defendant to submit to a forensic examination against his wishes well in advance of trial does not rise to the level of a fundamental conflict involving defendant's basic rights. We agree.

The appellate courts of this State have recognized four types of fundamental conflicts between attorney and client which include: counsel representing both co-defendants at trial, *State v. Leggett*, 61 N.C. App. 295, 300 S.E.2d 823 (1983); counsel attempting to prohibit defendant from testifying, *State v. Luker*, 65 N.C. App. 644, 310 S.E.2d 63 (1983), *rev'd on other grounds*, 311 N.C. 301, 316 S.E.2d 309 (1984); conflict over what plea to enter, *State v. Johnson*, 304 N.C. 680, 285 S.E.2d 792 (1982); and counsel conceding defendant's guilt, *State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504, *cert. denied*, 476 U.S. 1123, 90 L. Ed. 2d 672. None of these fundamental conflicts exist in this case.

In the present case, defendant has not shown ineffective assistance of counsel at trial or any impediment to the presentation

STATE v. ROBINSON

[330 N.C. 1 (1991)]

of his defense caused by the forensic examination. Also, defendant was provided additional counsel, and defendant concedes that he was satisfied with Ms. Goodson as his counsel. Defendant has failed to show any prejudice to himself by the trial court's pretrial denial of Boyan's and Green's motion to withdraw. "In the absence of any substantial reason for the appointment of replacement counsel, an indigent must accept counsel appointed by the court, unless he wishes to present his own defense." *State v. Hutchins*, 303 N.C. 321, 335, 279 S.E.2d 788, 797 (1981). We therefore reject defendant's contention that the trial court committed prejudicial error by refusing to allow his appointed counsel to withdraw.

II.

JURY SELECTION

[2] Defendant contends that the trial court erred by restricting his questions to prospective jurors during voir dire with respect to jurors' feelings about racial prejudice. Defendant contends that his trial counsel attempted to engage in an in-depth voir dire examination of prospective jurors concerning racial bias, and that this effort was understandable in light of the interracial nature of the crime.

The trial court allowed defendant to question prospective jurors as to whether racial prejudice would affect their ability to fairly and impartially determine defendant's guilt. The trial court also allowed defendant to ask certain questions of prospective white jurors concerning their associations with blacks in general, such as whether blacks had visited their homes, whether black people worked where they were employed, and whether blacks had attended school with them. However, the trial court sustained prosecution objections to such questions as:

> Do you feel like the presence of blacks in your neighborhood has lowered the value of your property or had any effect on it adversely at all?
>
> Have you ever seen any examples of discrimination in your place of work?
>
> Do you have any particular feeling about black people [from] your association [with] them?
>
> Do you think that racial discrimination exists in Guilford County?

STATE v. ROBINSON

[330 N.C. 1 (1991)]

Do you belong to any social club or political organization or church in which there are no black members?

Defendant contends that the questions permitted by the trial court would not have materially assisted defense counsel in exercising peremptory challenges because only an openly biased person would have answered the questions permitted by the trial court in the affirmative. Defendant argues that the questions permitted by the trial court would not elicit responses indicative of the more subtle forms of racial bias still present in our society. Therefore, defendant argues, the trial court's restriction upon defense counsel's ability to make inquiry into racial bias violated his rights under the sixth, eighth, and fourteenth amendments to the United States Constitution and Article 1, sections 19, 24, 26, and 27 of the North Carolina Constitution.

The State contends that the trial court properly limited defendant to relevant questions of potential jurors, and the trial court did not abuse its discretion in its control of voir dire. We agree.

In *Turner v. Murray*, 476 U.S. 28, 90 L. Ed. 2d 27 (1986), the United States Supreme Court held that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias. This rule, the Court announced, is "minimally intrusive," and the "trial judge retains discretion as to the *form and number of questions* on the subject, including the decision whether to question the venire individually or collectively." *Id.* at 37, 90 L. Ed. 2d at 37 (emphasis added).

In this case, the trial court allowed defendant to question each juror as to whether racial prejudice would interfere with his or her ability to render a fair and impartial verdict, as well as other general questions such as those mentioned above. It is worth noting that, in *Turner*, the question which the trial court had initially disallowed, and which the United States Supreme Court held proper, was: "Will these facts (that defendant is black and the victim is white) prejudice you against (the defendant) or affect your ability to render a fair and impartial verdict based solely on the evidence?" *Id.*

In North Carolina, it is well settled that the trial court has broad discretion in controlling the questioning of prospective jurors, and its decisions will be upheld absent a showing of abuse of discre-

tion. *State v. Laws*, 325 N.C. 81, 109, 381 S.E.2d 609, 625 (1989), *death sentence vacated*, --- U.S. ---, 108 L. Ed. 2d 603 (1990). "Regulation of the *manner and the extent* of inquiries on voir dire rests largely in the trial judge's discretion." *State v. Allen*, 322 N.C. 176, 189, 367 S.E.2d 626, 663 (1988) (emphasis added). A trial judge may be reversed for abuse of discretion only upon a showing that its ruling "was so arbitrary that it could not have been the result of a reasoned decision." *Id.*

Given the latitude which the trial court did allow defense counsel in this case, the United States Supreme Court's "minimally intrusive" rule in *Turner*, and the broad discretion afforded trial courts in this area, we cannot say that the trial court in this case abused its discretion.

[3] In the next issue raised by defendant, he contends that the trial court committed prejudicial error by allowing the State to challenge for cause certain jurors whose voir dire testimony, when viewed in context and in its entirety, failed to demonstrate that their personal views concerning the death penalty would prevent or substantially impair their ability to perform their duties in accordance with the trial court's instruction and their oaths. We disagree.

During the jury voir dire examination, counsel for both parties inquired into the ability of prospective jurors to render a capital sentencing decision on the basis of the evidence and the applicable law. The trial judge excused several prospective jurors because of the effect that their personal opinions concerning capital punishment would have upon their ability to decide the case on the basis of the law and the evidence. Defendant argues that two of the trial judge's rulings in this respect were erroneous.

The State contends that the two rulings to which defendant takes issue were proper. The State argues that the two jurors were properly removed for cause because both responded to questions in a manner revealing that their stated opposition to the death penalty would prevent or substantially impair the performance of their duties as jurors.

During the voir dire examination of the two prospective jurors at issue, when the first was asked by the trial judge if "[i]t automatically would be life imprisonment in your case because of your opposition to the death penalty?" the prospective juror replied,

STATE v. ROBINSON

[330 N.C. 1 (1991)]

"Yes." After indicating that she had personal views against the death penalty, the trial judge asked the second prospective juror, "[a]nd do you feel those personal views would interfere with your ability to fairly consider both punishments, life imprisonment and death?" She replied, "Yeh, it would."

The answers given by the prospective jurors at issue are similar to an answer given by a prospective juror in *State v. Quesinberry*, 325 N.C. 125, 139, 381 S.E.2d 681, 690 (1989), *death sentence vacated*, --- U.S. ---, 108 L. Ed. 2d 603 (1990), who answered that she would automatically vote for life imprisonment. This Court held that the prospective juror was properly removed for cause. *Id.* Again, in the present case, we find that the prospective jurors at issue were properly removed for cause. The answers given reveal that their beliefs would "prevent or substantially impair the performance of [their] duties as [jurors] in accordance with [their] instructions and [their] oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)). Thus, we reject defendant's argument that the trial judge erred in excusing the prospective jurors for cause.

[4] In defendant's next argument, he asserts that the trial court erred by allowing the State to peremptorily challenge black jurors on the basis of their race. *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986); N.C. Const. art. I, § 26. Although the defendant in this case is black, as was the defendant in *Batson*, we note that the United States Supreme Court has recently held that a white defendant also has standing to assert an equal protection claim when a prosecutor uses peremptory challenges to exclude potential jurors "solely by reason of their race." *Powers v. Ohio*, --- U.S. ---, ---, 113 L. Ed. 2d 411, 424 (1991).

Borrowing from its Title VII jurisprudence, the Supreme Court in *Batson* set out a two-step process to determine whether a prosecutor has impermissibly used race to discriminate against potential jurors during jury selection. First, a criminal defendant must make out a prima facie case of discrimination by demonstrating that the prosecutor has exercised peremptory challenges to remove potential jurors solely because of their race and that this fact and other relevant circumstances raise an inference of discrimination. *Batson v. Kentucky*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, *as modified by Powers v. Ohio*, --- U.S. ---, 113 L. Ed. 2d 411. Once

STATE v. ROBINSON

[330 N.C. 1 (1991)]

a prima facie case is established, the burden shifts to the prosecutor to come forward with a nonracial, neutral explanation for the peremptory challenges. *Batson v. Kentucky*, 476 U.S. at 97, 90 L. Ed. 2d at 88. Consistent with Title VII case law, this Court has permitted a third step, allowing a defendant to introduce evidence that the State's explanations are a pretext. *State v. Greene*, 324 N.C. 238, 240, 376 S.E.2d 727, 728 (1989); *cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 36 L. Ed. 2d 668, 679 (1973).

In this case, defendant objected each time the State peremptorily challenged a black juror, and on each occasion the trial judge conducted a hearing in chambers during which the State voluntarily stated its reasons for each challenge. The trial court, on each occasion, denied defendant's objection. Prior to the jurors being sworn and impaneled, defendant made a motion to discharge the entire panel. At this point, the trial judge conducted an additional hearing and subsequently entered an order outlining his findings of fact and conclusions of law.

The trial court found that of ninety-nine potential jurors examined, eighty-one were white, eighteen were black. Of the eighty-one white jurors, thirty-six were excused for cause, six as being opposed to capital punishment, and sixteen by peremptory challenges of the defendant. Of the remaining twenty-three potential jurors, ten were peremptorily challenged by the State, eleven were seated as jurors and two were chosen as alternates. Thus, of the twenty-three white potential jurors available to the State, forty-three percent were peremptorily challenged.

The trial court found that of the eighteen potential black jurors, five were excused for cause, one by the consent of both parties and six as being opposed to capital punishment. Of the remaining six potential jurors, five were peremptorily challenged by the State and one was chosen as a juror. Thus, of the six black potential jurors available to the State, eighty-three percent were peremptorily challenged.

The trial court concluded that defendant had failed to make out a prima facie case of discrimination, but that even if the defendant were found to have met his initial burden, the State had articulated neutral explanations for its peremptory challenges. Defendant challenges both conclusions.

**STATE v. ROBINSON**

[330 N.C. 1 (1991)]

We find it unnecessary to address the trial court's conclusion that defendant failed to make a prima facie case of discrimination because in this case the State voluntarily proffered explanations for each peremptory challenge. Given that the purpose of the prima facie case is to shift the burden of going forward to the State, there is no need for us to examine whether defendant met his initial burden. *See United States v. Lane*, 866 F.2d 103, 105 (4th Cir. 1989), *United States v. Woods*, 812 F.2d 1483, 1487 (4th Cir. 1987). We proceed, therefore, as if the prima facie case had been established.

In order to rebut a prima facie case of discrimination, the prosecution must "articulate legitimate reasons which are clear and reasonably specific and related to the particular case to be tried which give a neutral explanation for challenging jurors of the cognizable group." *State v. Jackson*, 322 N.C. 251, 254, 368 S.E.2d 838, 840 (1988), *cert. denied*, 490 U.S. 1110, 104 L. Ed. 2d 1027 (1989). These reasons " 'need not rise to the level justifying exercise of a challenge for cause.' " *State v. Porter*, 326 N.C. 489, 498, 391 S.E.2d 144, 151 (1990) (quoting *Batson v. Kentucky*, 476 U.S. at 97, 90 L. Ed. 2d at 88). "So long as the motive does not appear to be racial discrimination, the prosecutor may exercise peremptory challenges on the basis of 'legitimate hunches and past experience.' " *Id.* at 498, 391 S.E.2d at 151 (quoting *State v. Antwine*, 743 S.W.2d 51, 64 (Mo. 1987) (en banc), *cert. denied*, 486 U.S. 1017, 100 L. Ed. 2d 217 (1988) ). "Since the trial judge's findings . . . will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson v. Kentucky*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21.

With these general guidelines in mind, we turn our attention to the State's reasons for peremptorily challenging each of the five black potential jurors.

J.B. was the first black prospective juror peremptorily challenged by the State. The district attorney gave the following reasons for challenging Ms. B.: that she did not pay attention during the court's instructions, and that she was a witness for her husband, who was convicted of manslaughter ten years ago in a case prosecuted by the Guilford County District Attorney's office. Because of this prior experience with the criminal justice system, the district attorney argued that Ms. B. would not be a fair and impartial juror.

STATE v. ROBINSON

[330 N.C. 1 (1991)]

The second black prospective juror peremptorily challenged was J.R. The district attorney gave the following reasons for rejecting Mr. R.: that he had been convicted of misdemeanor larceny in 1979 in Guilford County; that he was also convicted of larceny and a worthless check charge in 1980, but had failed to mention these convictions on his jury questionnaire; that he failed to comply with court orders on three separate occasions; that he fathered an illegitimate child, which the State argued exhibits some degree of irresponsibility toward the law; that he was a witness for a defendant in a trespass case; and that while the State was seeking a juror who had given some thought to capital punishment, Mr. R. stated that he had no personal feelings on the death penalty. After reciting his objections, the district attorney told the trial court that he did not believe Mr. R. would be "disposed to be a fair and impartial juror toward the State of North Carolina in this particular case."

Prospective juror E.N. was the third black juror peremptorily challenged by the State. The district attorney gave the following reasons for rejecting Mr. N.: that he was very active in his church as a trustee, president and chairman of various groups within the church, and that in the opinion of the district attorney, individuals who are very active within their church tend to be lenient, more favorable to the defendant and not likely to give the State a fair and impartial trial; that Mr. N. was "deceptive" in failing to disclose on his jury questionnaire that he had been convicted in 1977 for carrying in excess of one gallon of liquor, indicating to the district attorney that Mr. N. would not be a fair and impartial juror; and that Mr. N. had served on at least two civil juries, which could produce confusion over the appropriate burden of proof to be applied.

The fourth black prospective juror to be peremptorily challenged by the State was M.P. Ms. P. said she was not sure if she could consider the death penalty as a possible punishment for this case, and that she would vote for life imprisonment if it were an option. Defense counsel was able to rehabilitate her, and the State's challenge for cause was denied. Ms. P. also had been questioned recently as a suspect in a possible theft and forgery of a housing authority check by Detective McNeil, the State's chief investigator and witness in the case on trial. Yet, Ms. P. did not mention her knowledge of Detective McNeil when asked on her jury questionnaire whether she knew the named witnesses. The district attorney argued that Ms. P.'s failure to acknowledge Detec-

**STATE v. ROBINSON**

[330 N.C. 1 (1991)]

tive McNeil and the fact that she had been recently interviewed as a possible suspect in a felony "would limit her ability to be fair and impartial to the state."

Prospective juror J.K. was the final black juror peremptorily challenged by the State. The district attorney stated that Ms. K. was challenged because she had indicated on her jury questionnaire that she had never been a criminal defendant or a witness in a criminal case, despite convictions of driving under the influence in 1982 and a stop sign violation in 1983. The district attorney argued that this "deception" indicated that Ms. K. would not be a fair and impartial juror.

Defendant argues that after accepting the first black prospective juror available to the State, the district attorney peremptorily challenged every black potential juror not excused for cause. Defendant also argues that the State accepted some white veniremen with the same or similar backgrounds to black jurors who were excluded. For example, the defendant argues that the State accepted several white jurors who were active in their churches, yet excused Mr. N. for being active in his church.

While it is proper for a trial judge to consider whether similarly situated whites are accepted as jurors, defendant's approach in this case, like that taken by the defendant in *Porter,* "involves finding a single factor among several articulated by the prosecutor . . . and matching it to a passed juror who exhibited that same factor." *State v. Porter,* 326 N.C. at 501, 391 S.E.2d at 152. This approach "fails to address the factors as a totality which when considered together provide an image of a juror considered . . . undesirable by the State." *Id.*

When considered in this light, we believe the State has met its burden of coming forward with neutral, nonracial explanations for each peremptory challenge. Among other factors, three potential jurors failed to reveal past criminal histories as required by the jury questionnaire; a fourth juror did not admit she was acquainted with the State's chief investigator and witness; and a fifth juror had previously testified for her husband in a manslaughter case prosecuted by Guilford County prosecutors.

Defendant acknowledges in his brief that he did not introduce evidence to rebut the State's explanations. Although it is not necessary for the defendant to offer such rebuttal evidence in order

to prevail, we are unable, given the great deference owed the trial court in this type of challenge, to find the district attorney's nonracial explanations to be pretext. The defendant's *Batson* challenge is therefore denied.

## III.

### GUILT-INNOCENCE PHASE

[5] In defendant's next argument, he contends that the trial court committed prejudicial error by conducting motion hearings, legal arguments, *Batson* hearings, and other proceedings in his absence contrary to his unwaivable right of personal presence. Defendant contends that the trial court conducted approximately 110 separate proceedings in his absence during the trial. Defendant argues that it is well settled that an accused cannot waive his right to be present at every stage of his trial upon indictment charging him with a capital felony, and defendant cites *State v. Smith*, 326 N.C. 792, 392 S.E.2d 362 (1990), to support his argument. Defendant also argues that to conduct any portion of a capital trial in the defendant's absence constitutes error of constitutional magnitude and constitutes prejudicial error.

The present case can be distinguished from *Smith*, because in the instant case, defendant's counsel was a part of each of the proceedings conducted out of defendant's presence. Also, unlike *Smith*, here the court reporter recorded and transcribed all of the conferences. Thus, this Court can review the transcript to determine whether any error was prejudicial. Nevertheless, as we stated in *State v. Brogden*, 329 N.C. 534, 407 S.E.2d 158 (1991):

> Article I, section 23 of the North Carolina Constitution guarantees a criminal defendant the right to be present at *every stage* of his trial. *State v. Huff*, 325 N.C. 1, 381 S.E.2d 635 (1989), *judgment vacated on other grounds*, --- U.S. ---, 111 L. Ed. 2d 777 (1990). Our state Constitution provides a broader right than the federal Constitution and mandates that a defendant's presence cannot be waived. *See State v. Payne*, 328 N.C. 377, 402 S.E.2d 582 (1991).

> However, error caused by the absence of the defendant at some portion of his capital trial does not require automatic reversal. This Court has adopted the "harmless error" analysis in cases where a defendant is absent during a portion of his capital trial. *State v. Huff*, 325 N.C. 1, 381 S.E.2d 635. The

State has the burden of establishing that the error was harmless beyond a reasonable doubt. *Id.; State v. Payne*, 328 N.C. 377, 402 S.E.2d 582.

329 N.C. at 541, 407 S.E.2d at 163. After careful review of the record, we conclude that the State has met its burden by showing that defendant's absence from the conferences in this case was harmless beyond a reasonable doubt.

All but six of the conferences complained of by defendant were bench conferences at which all five counsel conferred with the judge while the conferences were being recorded by the court reporter. The six proceedings which were not bench conferences involved the *Batson* issue during jury selection. The court reporter was present at all times and recorded and transcribed the complete proceedings. The subjects of the conferences and discussions were either points of law, procedural matters, or administrative matters. None involved communication with the jury, and no witness gave testimony concerning defendant's guilt. Under the circumstances, we are satisfied that defendant's absence during the conferences and discussions did not prejudice defendant in any way. We thus find the error harmless beyond a reasonable doubt.

[6] In defendant's next argument, he contends that the trial court committed prejudicial error by permitting Detectives Grubb and McNeil to testify that the dumpster in which money bags and other physical evidence had allegedly been placed had been emptied prior to being searched by law enforcement officers. Defendant argues that the testimony of Detectives Grubb and McNeil concerning the emptying of the dumpster prior to their 8 March 1986 search contains no indication that either witness personally observed the emptying of that container, and was therefore inadmissible under Rule 602 of the North Carolina Rules of Evidence. N.C.G.S. § 8C-1, Rule 602 (1988). Furthermore, defendant argues that the only reasonable inference permitted by their testimony is that an employee of the Thomasville Sanitation Department told the officers that the dumpster had been emptied between 2 March and 8 March 1986, and therefore the testimony was inadmissible hearsay. N.C.G.S. § 8C-1, Rule 801(c) (1988).

Defendant argues that this testimony was crucial because it provided an explanation as to why the evidence was not found in the dumpster. Police were led to the dumpster by Thomas Wood, who testified at trial that he had driven defendant to the Western

Steer the night of the crime. Without this evidence, defendant argues, Wood's credibility would have been seriously damaged.

The State contends, and defendant concedes, that defendant did not object to or make a motion to strike the testimony at trial. Thus, defendant waived his right to argue before an appellate court that the trial judge erred by allowing the evidence. N.C.R. App. P. 10(b)(1); N.C.G.S. § 15A-1446(a) (1988); N.C.G.S. § 8C-1, Rule 103(a)(1) (1988). Nevertheless, defendant contends that the failure of the trial judge to act *ex mero motu* to exclude the testimony should be considered by this Court under the "plain error" rule.

We find it unnecessary to address the merits of defendant's argument. Even assuming, *arguendo*, that the testimony at issue was improperly admitted, we do not believe defendant has met the heavy burden placed on him under the plain error rule.

Before granting a new trial to a defendant under the plain error rule, the appellate court must be convinced that absent the alleged error, a jury probably would have reached a different verdict. *State v. Mitchell*, 328 N.C. 705, 711, 403 S.E.2d 287, 290 (1991); *State v. Black*, 308 N.C. 736, 303 S.E.2d 804 (1983). The appellate court must determine that the error in question "tilted the scales" in favor of conviction. *State v. Short*, 322 N.C. 783, 790, 370 S.E.2d 351, 355 (1988).

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot be done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has "resulted in a miscarriage of justice or in the denial to appellant of a fair trial" or where the error is such as to "seriously affect the fairness, integrity, or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's findings that the defendant was guilty."

*State v. Mitchell*, 328 N.C. at 711, 403 S.E.2d at 290 (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)).

We do not believe the testimony at issue "tilted the scales" in favor of conviction. The jury heard and saw the two survivors

STATE v. ROBINSON

[330 N.C. 1 (1991)]

of the attack identify defendant as the man who shot them and Page at point-blank range. The jury heard testimony from Wood that he (Wood) drove defendant to the steak house the night of the crime. The detectives' explanation as to why the money bags and other evidence were not found in a dumpster was not, we believe, the key piece of evidence which convinced the jury of defendant's guilt.

[7] Next, defendant argues that the trial court committed prejudicial error by refusing to sustain his objection to certain testimony by fingerprint expert witness Lyman Lance to the effect that he had discovered identifiable fingerprints in only three percent of the criminal cases in which he had been involved. The State inquired of Sergeant Lance, "based on your training and experience in latent fingerprint lifting, identification, and comparison, in what percentage of your cases have you been able to match positively a latent lifted print with a known print?" Defense counsel objected, and after a voir dire hearing, the trial judge allowed the testimony, stating that it would be within the witness' knowledge. Defendant argues that the testimony was irrelevant and its admission into evidence was prejudicial. We agree with defendant that this evidence, offered to explain the nonexistence of fingerprints at the crime scene, was irrelevant. However, we find it not prejudicial.

The State argues in its brief that many jurors are under a misapprehension that a defendant cannot be guilty unless his fingerprints are found at the scene of the crime. Therefore, according to the State, it elicited the testimony of Sergeant Lance in order to show that fingerprint matchups from a crime scene are the exception rather than the rule. The prosecutor, in explaining to the trial court the relevance of the testimony, said, "it goes to show the reason, in his opinion, for the nonexistence of a fact, that is, the nonexistence of a matching fingerprint."

Defendant argues that his fingerprints were not found at the crime scene, and the presence or absence of identifiable fingerprints at other crime scenes investigated by Sergeant Lance is not relevant to the presence or absence of fingerprint evidence in this case. We agree.

The fact that other defendants did not leave identifiable prints at other crimes scenes can be explained by a myriad of reasons. In *State v. Holden*, 321 N.C. 125, 362 S.E.2d 513 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988), relied on by the State

in this case, this Court upheld the testimony from a fingerprint expert that an individual does not always leave a latent print on an object. The fingerprint expert, when asked whether a person always leaves a latent fingerprint after touching an object, said: "No, an individual does not always leave latent fingerprints on an object when it[']s touched. It depends on the environment, object being touched and also the secretion of body fluids from the person against the object." *Id.* at 147, 362 S.E.2d at 528. This testimony merely offers a scientific explanation as to why fingerprints are sometimes not left behind after an object has been touched. This testimony, as defendant argues, explains the mechanics of fingerprinting.

North Carolina Rule of Evidence 401 provides:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

N.C.G.S. § 8C-1, Rule 401. While it may be helpful to the jury to understand general, scientific explanations regarding why a fingerprint may or may not be found at a crime scene, it is simply not relevant to the issues in this case that Sergeant Lance has found identifiable fingerprints in only three percent of the cases he has personally investigated. If this testimony is allowed, fingerprint experts might be asked the next logical question, *e.g.,* were the other cases in which fingerprints were not found similar to the case at hand? We decline to extend *Holden* to allow the testimony at issue in this case.

Although we find error in the admission of this testimony, we do not find the error prejudicial. Defendant was placed at the scene of the crime by three eyewitnesses. The fact that the State used this testimony to explain an absence of fingerprints does not create a "reasonable possibility" that a "different result would have been reached" had the evidence not been admitted. N.C.G.S. § 15A-1443(a) (1988).

[8] In defendant's next argument he contends that the trial court committed prejudicial error by sustaining the State's objection to testimony by witness Dr. Cole that ninety-one percent of the subjects in a particular identification experiment selected one of six black individuals as the perpetrator of a violent incident when

the actual perpetrator of that incident was not presented to the participants in the experimental identification. Defendant argues that he called Dr. Cole as a witness to attack the weight and credibility of the State's identification testimony, and because Dr. Cole had been found by the trial court to be an expert in the field of clinical psychology with emphasis in the area of perception and eyewitness identification, Dr. Cole should have been allowed to testify about the results of the experiment. The State contends that the testimony was not admissible because it concerns results of an experiment about which the witness had not given an opinion, and was therefore inadmissible hearsay.

Rule 703 of the North Carolina Rules of Evidence provides:

The fact or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subjects, the facts or data need not be admissible in evidence.

N.C.G.S. § 8C-1, Rule 703 (1986). This rule allows experts to rely on the opinions of other experts or upon facts or data not itself admissible as the basis of their own expert opinions. When a witness testifies to results of experiments after giving an opinion which was based on such experiments, such testimony is not hearsay because it is not offered for the truth of the matter, but to show the basis of the opinion. *State v. Jones*, 322 N.C. 406, 411-14, 368 S.E.2d 844, 846-48 (1988).

A review of the record reveals that Dr. Cole did express an opinion on "cross identification," *i.e.*, whites have a more difficult time identifying blacks than identifying other whites. After expressing this opinion, Dr. Cole was allowed to testify to the results of experiments in which white and black "assailants" came into his classroom at Clemson University, attacked him, and left the room. Dr. Cole told jurors that white students were able to identify the correct white assailant about eighty percent of the time, but were able to identify the correct black assailant only fifty to sixty-five percent of the time. The record, however, contains no opinion by Dr. Cole as to the accuracy of eyewitness identifications when the assailant is not present in the lineup. The question to which the State objected related to an experiment involving the accuracy of eyewitness identifications when the assailant was not present

in the lineup. The basis of the State's objection is this: If Dr. Cole had been allowed to give the results of this experiment, this evidence would have been admitted, not to show the basis of Dr. Cole's opinion, but to prove the inaccuracy of cross-racial identification when the assailant is not present in the lineup. Thus, the evidence would have been admitted to prove the truth of the matter asserted and, in this context, would be inadmissible hearsay.

If testimony regarding the results of this experiment had been admitted in order to rebut the State's eyewitness-identification testimony, its admission over the State's hearsay objection would have been clear error. If offered solely to show a basis for Dr. Cole's opinion that cross-racial identification is unreliable, the testimony would have been clearly admissible under Rule 703. Thus, the issue boils down to whether the trial court was correct in finding that Dr. Cole's opinion as to cross-racial identification was not specific enough to allow him to testify to the results of the experiment in question. We repeat that, for whatever reason, Dr. Cole never gave a specific opinion concerning the accuracy of eyewitness identification when the actual perpetrator is not in the lineup. We do not know whether Dr. Cole would have given such an opinion because the question was not asked, even on voir dire, after the hearsay objection was sustained. Although reasonable minds could differ, we do not believe the trial court abused its discretion in finding that Dr. Cole had not given an opinion specific enough to support admission of testimony regarding the experiment in question. Therefore, we reject defendant's argument.

[9] In defendant's next argument he contends that the trial court erred by failing to act *ex mero motu* to prevent the State's cross-examination of Dr. Sciara concerning the contents of a psychiatric report prepared by the forensic staff at Dorothea Dix without establishing that Dr. Sciara utilized this psychiatric report as part of the basis for the opinions to which he testified. Defendant argues that the State's cross-examination of Dr. Sciara relating to the Dorothea Dix report placed the observations and opinions of its authors before the jury when none of the members of the staff of the forensic unit at Dorothea Dix testified during the guilt-innocence phase of the trial. The State responds that Dr. Sciara testified that he had read the report, but that he disagreed with it; therefore, pursuant to North Carolina Rule of Evidence 705, it was not error for the prosecutor to cross-examine him concerning his rejection of the information contained in the report.

**STATE v. ROBINSON**

[330 N.C. 1 (1991)]

Defendant concedes that defense counsel failed to object at trial during the State's cross-examination of Dr. Sciara. Thus, we consider this assignment of error under the "plain error" standard. *State v. Mitchell*, 328 N.C. at 711, 403 S.E.2d at 290.

Defendant argues that the sole purpose of Dr. Sciara's testimony was to establish that deficiencies in defendant's ability to communicate facts resulted from a psychological condition rather than from fabrication. The State's success in attacking Dr. Sciara's testimony, defendant argues, created a substantial likelihood that the jury's failure to accept defendant's testimony rested heavily upon this attack upon Dr. Sciara's opinion.

Before granting a new trial to a defendant under the plain error rule, the appellate court must be convinced that absent the alleged error, the jury probably would have reached a different verdict. *Id.* We do not believe defendant has met this heavy burden. The jury heard testimony from defendant that he was in Thomasville, not High Point, on the night of the murder. The jury heard testimony from an alibi witness who testified that he had bought drugs from defendant in Thomasville around the time of the murder. The jury also heard testimony from three eyewitnesses who placed defendant at the scene of the crime. The jury believed the three eyewitnesses. We do not believe that absent the State's cross-examination of Dr. Sciara, the jury probably would have reached a different verdict. Having found that the defendant cannot satisfy the plain error standard, we find it unnecessary to reach the merits of defendant's argument.

[10] Next, defendant argues that the trial court committed prejudicial error by refusing to suppress the in-court identification testimony of Cotner and Hill on the grounds that these identifications were based upon impermissibly suggestive pretrial identification procedures which created a substantial likelihood of irreparable misidentification and that their pretrial identifications improperly tainted all subsequent in-court identifications. Defendant argues that the trial court incorrectly concluded that he waived his right to contest the identification testimony of Cotner and Hill by failing to file a written motion to suppress prior to trial. According to defendant, an oral suppression motion was proper in this case for two reasons. First, defendant contends that when the trial judge allowed his request for a physical lineup, the trial court stated that his trial counsel had the right to contest the State's identifica-

tion evidence by oral objection at the time any such testimony was proffered. Defendant further contends that the State did not object to this procedure. Second, defendant argues that he lacked a reasonable opportunity to file a written pretrial suppression motion. Defendant argues that the State did not provide him with copies of the descriptions given by Cotner and Hill to the police of the shorter man who perpetrated the crime until the day after the case was called for trial. Finally, defendant argues that several of the pictures in the photographic lineup did not match the descriptions given by Cotner or Hill. Therefore, defendant argues, the photographs were impermissibly suggestive.

The State responds that both Cotner and Hill were eyewitnesses to the crimes, as well as surviving victims, and each had the opportunity to view the defendant, who was not wearing a mask at the time of the crimes. The State contends that the evidence in this case supports the findings that both witnesses had ample opportunity to observe defendant at the time of the crimes and the pretrial identification procedures were not impermissibly suggestive. We agree.

Both witnesses were subjected to the following pretrial identification procedures: a photographic lineup shown to Cotner by Detectives Royal and McNeil on 11 March 1986 in which Cotner selected a photograph of defendant; a photographic lineup shown to Hill by Detective Royal on 11 March 1986, in which Hill selected defendant's photograph as looking like the person who shot him; and just prior to trial, some eighteen months after the crimes, counsel for defendant requested a live lineup procedure at which time both Cotner and Hill identified defendant as the perpetrator. At trial, during the testimony of Cotner and Hill, defense counsel objected to any in-court identification of defendant without counsel being given the opportunity for a voir dire to determine whether the identifications had been tainted by impermissible procedures. The trial judge heard arguments from both parties, at which time the State argued that defendant was procedurally barred from contesting the pretrial procedures pursuant to N.C.G.S. § 15A-975 because he failed to make a pretrial motion. The trial judge allowed voir dire hearings on the eyewitness identification.

At the conclusion of each of the voir dire hearings, the trial judge entered an order making extensive findings of fact and concluded that the pretrial identification procedures were in no way

suggestive or conducive to mistaken identification and that the witnesses' in-court identifications were of independent origin based solely on the observation of defendant at the time of the crimes. The findings of fact, defendant concedes, are generally consistent with the record evidence. The findings of fact made by the trial judge are supported by the evidence and are binding on this Court. *State v. Hunt*, 287 N.C. 360, 372, 215 S.E.2d 40, 48 (1975). These findings support the conclusions of law that the pretrial identification procedures were not tainted and that the in-court identifications were based solely on the witnesses' observation of defendant at the time of the crimes. Thus, the trial court did not err in denying defendant's motions to suppress the in-court identifications. *Id.* We need not address defendant's contention that some of the persons in the photographic lineup did not match the description given by Cotner and Hill because defendant did not raise this issue at the trial level. *State v. Benson*, 323 N.C. 318, 322, 372 S.E.2d 517, 519 (1988). We conclude, however, that defendant is not entitled to any relief under the plain error standard. *State v. Mitchell*, 328 N.C. at 711, 403 S.E.2d at 290.

[11] In defendant's next argument, he contends that the trial court committed prejudicial error by failing to submit the issue of defendant's guilt of second-degree murder to the jury on the grounds that the issue of defendant being guilty of second-degree murder arose upon the evidence and that the trial court's failure to submit that issue created an impermissible risk that the jury relied upon an invalid statutory aggravating circumstance at the sentencing hearing. Defendant argues that the trial judge should have instructed on second-degree murder because of the evidence "of panic, the very short amount of time that we're talking about, and the general circumstances of stress as described by both victims." Defendant contends that N.C.G.S. § 15A-1232 requires a trial court to submit "the different permissible verdicts arising on the evidence . . . under proper instructions." Finally, defendant argues that in the event that the jury had not convicted him of first-degree murder on the basis of malice, premeditation, and deliberation, the trial court could not have submitted the underlying robbery as an aggravating circumstance at the sentencing hearing. *State v. Cherry*, 298 N.C. 86, 257 S.E.2d 551 (1979), *cert. denied*, 446 U.S. 941, 64 L. Ed. 2d 796 (1980).

The State argues that there was no evidence showing a lack of premeditation, deliberation and intent to kill; thus, there was

no requirement to submit a second-degree murder verdict. We agree. In *State v. Strickland*, 307 N.C. 274, 298 S.E.2d 645 (1983), *overruled in part on other grounds, State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986), this Court held:

> If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is no evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.

307 N.C. at 293, 298 S.E.2d at 658. Defendant presented no evidence to negate premeditation, deliberation and intent to kill. The State's evidence showed that defendant robbed a restaurant at night, ordered the victims to lie down and then methodically aimed and shot them. This evidence is sufficient to show premeditation and deliberation. *See State v. Fields*, 315 N.C. 191, 337 S.E.2d 518 (1985); *State v. Bray*, 321 N.C. 663, 365 S.E.2d 571 (1988). There was no credible evidence to the contrary. Defendant's defenses were alibi, misidentification by the eyewitnesses, and lying by co-defendant Woods. Under these circumstances, we reject defendant's argument that the trial court erred by not instructing the jury on second degree murder.

[12] Next, defendant contends that the trial court committed prejudicial error by refusing to intervene *ex mero motu* during the prosecutors' arguments to the jury at the guilt-innocence phase of the trial and to preclude prosecutors from making arguments to the jury which were contrary to the evidence, abusive, misstated the applicable law, and infringed upon defendant's constitutional rights. Defendant argues that the prosecutors' arguments made repeated references to Page's suffering and went beyond permissible reminder of the rights of victims. Defendant further argues that the prosecutors repeatedly stepped outside their role as representatives of the State and asserted that they were, in fact, representing Page and other victims of crimes. Defendant also contends that the prosecutors improperly attacked his character.

The State calls attention to the fact that defendant did not object to the arguments about which he now complains. The State contends that all of the prosecutors' arguments were fully grounded in the evidence, that there was no impropriety in the arguments

by the prosecutors, and certainly no gross impropriety which would warrant a new trial.

Trial counsel is given wide latitude in the argument of hotly contested cases and they are permitted to argue the facts and evidence, all reasonable inferences from those facts, and the relevant law. Control of counsel's argument is largely left to the trial court's discretion. *State v. Covington*, 290 N.C. 313, 226 S.E.2d 629 (1976); *State v. Whisenant*, 308 N.C. 791, 303 S.E.2d 784 (1983). "Where a defendant does not object at trial to an allegedly improper jury argument, it is only reversible error for the trial judge not to intervene *ex mero motu* where the argument is so grossly improper as to be a denial of due process." *State v. Zuniga*, 320 N.C. 233, 257, 357 S.E.2d 898, 914, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987). Upon review of the record, we conclude that the arguments of the prosecutors were not so grossly improper as to constitute a denial of defendant's due process rights. Thus, we find no reversible error.

## IV.

### SENTENCING PHASE

[13] In his next five arguments, defendant contends that the trial court committed several errors during his sentencing proceeding. Since we find defendant is entitled to a new sentencing proceeding under *McKoy*, we address only that issue.

The trial court instructed the jury both verbally and in writing that in order to find the existence of any mitigating circumstance, the jury's finding must be unanimous. In *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369, the United States Supreme Court held that such instructions in a capital case violated the eighth and fourteenth amendments of the federal Constitution. The State concedes *McKoy* error, but argues it was harmless. Because the error is of constitutional dimension, the State bears the burden of demonstrating that it was harmless beyond a reasonable doubt. *State v. McKoy*, 327 N.C. 31, 44, 394 S.E.2d 426, 433 (1990); N.C.G.S. § 15A-1443(b) (1988). We conclude the State has failed to meet its burden.

The trial court submitted and the jury unanimously found three aggravating circumstances: (1) defendant had been previously convicted of a felony involving the threat of violence to the person; (2) the murder was committed while defendant was engaged in

the commission of a robbery; and (3) the murder was part of a course of conduct in which the defendant engaged and that course of conduct included the commission by defendant of other crimes of violence against other persons. N.C.G.S. § 15A-2000(e)(3), (5), (11) (1988).

The trial court submitted nine possible mitigating circumstances to the jury. The jury unanimously found seven. It did not, however, find two: (1) that the mental age of the defendant at the time of the murder is a mitigating circumstance; and (2) any other circumstance or circumstances arising from the evidence which the jury deems to have mitigating value. Thus, when weighing the mitigating circumstances against the aggravating circumstances to determine if the latter were sufficiently substantial to call for the imposition of the death penalty, individual jurors did not include these two mitigating circumstances.

We need only address the "mental age" circumstance to resolve this issue. Although this circumstance is not listed in N.C.G.S. § 15A-2000(f), "our cases plainly indicate that the mentality of a defendant is generally relevant to sentencing and that it can, with supporting evidence, be properly considered in mitigation of a capital felony." *State v. Pinch*, 306 N.C. 1, 28, 292 S.E.2d 203, 224, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 1031 (1982), *overruled in part on other grounds, State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), *overruled in part on other grounds, State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988); *see also State v. Fullwood*, 329 N.C. 233, 235, 404 S.E.2d 842, 843 (1991); *State v. Artis*, 325 N.C. 278, 313, 384 S.E.2d 470, 490 (1989), *death sentence vacated*, --- U.S. ---, 108 L. Ed. 2d 604 (1990).

The State suggests there was not enough evidence introduced to support a finding that defendant's mental age was "low" enough to be considered a mitigating circumstance. We disagree. Through the testimony of Dr. Sciara, a trained psychologist, defendant offered credible evidence that defendant was functioning in a mentally retarded range of intellect with an I.Q. that placed him in the lowest two percent of the population. Dr. Sciara, a clinical psychologist, testified at the sentencing proceeding that:

Dwight Robinson is functioning in a mentally retarded range of intellect. He has a full scale I.Q. of 69. An I.Q. at that level would put him in the lowest two percent of the population. That is, out of every 100 people, 98 would be smarter

than him, basically. At that level, he's functioning at about a fourth grade level, in terms of how he processes information, how he deals with facts, how he can use his intellect.

Although the State argues this testimony is contrary to that of a Dorothea Dix psychiatrist, we believe it is sufficient to allow a reasonable juror to find that the defendant's mental age is below normal.

The State further suggests that even if credible evidence existed to support this circumstance, the jury had already taken the defendant's mental age into account when it unanimously found the existence of a statutory circumstance submitted to the jury, *i.e.*, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. N.C.G.S. § 15A-2000(f)(6) (1988).

The trial court gave the following instructions to the jury with regards to mitigating circumstance (f)(6):

You would find this mitigating circumstance if you find that the defendant was under the influence of drugs or alcohol *or* suffering from a mental condition and that this impaired his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law . . . .

(Emphasis added.) Accordingly, the jury did not necessarily consider the defendant's mental condition when deciding the (f)(6) circumstance; rather, it could have found impaired capacity based solely on the overwhelming evidence of the defendant's regular drug usage. Where there is evidence to support a mitigating circumstance on either of two grounds, and the jury is so instructed, an appellate court should not speculate as to which ground served as the basis of the jury's finding.

Furthermore, as we recently said in *State v. Greene*, 329 N.C. 771, 408 S.E.2d 185 (1991), "[e]ach mitigating circumstance is a discrete circumstance. Each has its own meaning and effect." 329 N.C. at 776, 408 S.E.2d at 187. Although both circumstances under consideration in *Greene* were statutory, we believe the same reasoning applies in this case where one circumstance, impaired capacity, is statutory, and another circumstance, mental age, is nonstatutory.

Finally, the State suggests that the evidence of guilt and aggravating circumstances is so overwhelming in this case, that even

STATE v. ROBINSON

[330 N.C. 1 (1991)]

if there was credible evidence to support the mental age cir-
cumstance, no reasonable juror could balance the aggravating and
mitigating circumstances and recommend life imprisonment instead
of death. Again, we do not agree. As we said in *McKoy*, "it would
be a rare case in which a *McKoy* error could be deemed harmless."
*McKoy*, 327 N.C. at 44, 394 S.E.2d at 433. Since we began reviewing
cases for *McKoy* error, the Court has found two such cases. *State
v. Laws*, 328 N.C. 550, 402 S.E.2d 573 (1991) (individual polling
of jurors disclosed unanimity of rejection of submitted mitigating
circumstance); *State v. Roper*, 328 N.C. 337, 402 S.E.2d 600 (1991)
(jury found all fifteen mitigating circumstances submitted). The
other twenty-six cases handed down by this Court as of 5 September
1991 have found the *McKoy* error not to be harmless beyond a
reasonable doubt.[1] In each of these cases, the Court has found
credible evidence supporting at least one submitted, but unfound
mitigating circumstance. And in each of these cases, this Court
has chosen not to usurp the jury function by weighing the mitigating
circumstances against the aggravating circumstances ourselves in
order to determine whether the defendant should live or die. As
we stated in a recent case:

> We have not thought it our function, in resolving the
> harmlessness issue, to surmise how one or more jurors might
> weigh the aggravating and mitigating evidence, which is cap-
> sulized in the form of individually submitted "circumstances."

---

1. *State v. Greene*, 329 N.C. 771, 408 S.E.2d 185 (1991); *State v. Quick*, 329
N.C. 1, 504 S.E.2d 179 (1991) (Meyer, J., dissenting as to *McKoy* issue) (4-3); *State
v. Bonney*, 329 N.C. 61, 405 S.E.2d 145 (1991); *State v. Joyner*, 329 N.C. 211, 404
S.E.2d 653 (1991); *State v. Fullwood*, 329 N.C. 233, 404 S.E.2d 842 (1991); *State
v. Cummings*, 329 N.C. 249, 404 S.E.2d 849 (1991); *State v. Stager*, 329 N.C. 278,
406 S.E.2d 876 (1991) (Meyer, J., dissenting as to *McKoy* issue) (6-1); *State v. Ali*,
329 N.C. 394, 407 S.E.2d 183 (1991); *State v. Thomas*, 329 N.C. 423, 407 S.E.2d
141 (1991); *State v. Wynne*, 329 N.C. 507, 406 S.E.2d 812 (1991) (Meyer, J., dissenting
as to *McKoy* issue) (5-2); *State v. Brogden*, 329 N.C. 534, 407 S.E.2d 158 (1991);
*State v. McPhail*, 329 N.C. 636, 406 S.E.2d 591 (1991); *State v. Lloyd*, 329 N.C.
662, 407 S.E.2d 218 (1991); *State v. Artis*, 329 N.C. 679, 406 S.E.2d 827; *State
v. Green*, 329 N.C. 686, 406 S.E.2d 852 (1991); *State v. Smith*, 328 N.C. 99, 400
S.E.2d 712 (1991); *State v. Quesinberry*, 328 N.C. 288, 401 S.E.2d 632 (1991) (Meyer,
J., dissenting) (5-2); *State v. Payne*, 328 N.C. 377, 402 S.E.2d 582 (1991); *State
v. Huff*, 328 N.C. 532, 402 S.E.2d 577 (1991); *State v. Brown*, 327 N.C. 1, 394
S.E.2d 434 (1990); *State v. McKoy*, 327 N.C. 31, 394 S.E.2d 426 (1990); *State v.
Sanders*, 327 N.C. 319, 395 S.E.2d 412 (1990); *State v. Robinson*, 327 N.C. 346,
395 S.E.2d 402 (1990); *State v. McNeil*, 327 N.C. 388, 395 S.E.2d 106 (1990); *State
v. Sanderson*, 327 N.C. 397, 394 S.E.2d 803 (1990); *State v. Jones*, 327 N.C. 439,
396 S.E.2d 309 (1990).

This function, we continue to believe, is solely for the trial jurors who hear the evidence and are properly instructed on the law.

*State v. Lloyd*, 329 N.C. 662, 668, 407 S.E.2d 218, 222 (1991). Although the mitigating circumstances under consideration in *Lloyd* were statutory, this Court has granted a new sentencing hearing when only nonstatutory circumstances were at issue. *State v. Stager*, 329 N.C. 278, 406 S.E.2d 876 (1991) (new sentencing proceeding ordered even though the only mitigating circumstance not found by the jury was the "catch-all").

Given the testimony by defendant's expert witness, we cannot say beyond a reasonable doubt that no reasonable juror could have found this evidence to be credible and given it mitigating value. Furthermore, we cannot say beyond a reasonable doubt that no reasonable juror, upon weighing this circumstance along with the other mitigating circumstances, could have concluded that life imprisonment rather than death was the appropriate punishment. We conclude, therefore, that defendant is entitled to a new sentencing proceeding because the State has failed to meet its burden of satisfying this Court that the erroneous unanimity instructions were harmless beyond a reasonable doubt.

Defendant's remaining arguments relate to issues that defendant acknowledges have previously been decided by this Court contrary to his position. Nonetheless, he brings these arguments forward to preserve for further appellate review. Since we have previously decided those issues contrary to defendant's position, defendant's related arguments are overruled. *See State v. Smith*, 328 N.C. 99, 139, 400 S.E.2d 712, 735 (1991); *State v. Payne*, 327 N.C. 194, 210, 394 S.E.2d 158, 166 (1990), *cert. denied*, --- U.S. ---, 112 L. Ed. 2d 1062 (1991).

We find no error in the guilt phase of defendant's capital trial; however, we find *McKoy* error in the sentencing phase. We therefore vacate the sentence of death and remand the case to Superior Court, Guilford County, for a new capital sentencing proceeding in the first-degree murder case.

For the reasons stated, we find no error in the robbery with a dangerous weapon conviction, and the assault with a deadly weapon with intent to kill inflicting serious injury convictions, but remand the murder conviction to the Superior Court, Guilford County, for

a new capital sentencing proceeding not inconsistent with this opinion or the opinion of the United States Supreme Court in *McKoy*.

No. 86CRS25055, robbery with a dangerous weapon—no error.

No. 87CRS20031, assault with a deadly weapon with intent to kill inflicting serious injury—no error.

No. 87CRS20032, assault with a deadly weapon with intent to kill inflicting serious injury—no error.

No. 86CRS25054, first-degree murder—guilt phase:—no error; sentencing phase: death sentence vacated; remanded for new capital sentencing proceeding.

Justice MITCHELL concurring in part and dissenting in part.

I concur in the result reached by the majority in its conclusion and holdings that the defendant's convictions for first-degree murder, robbery with a dangerous weapon and two counts of assault with a deadly weapon with intent to kill inflicting serious injury were without error. I dissent from that part of the decision of the majority vacating the death sentence entered against the defendant and remanding this case for a new capital sentencing proceeding.

I believe the majority is unwise to speculate by way of *obiter dictum* as to the circumstances under which testimony concerning experiments conducted by the defendant's witness, psychologist Spurgeon Cole, might be admissible to support an opinion formed by Cole, in his capacity as an expert in clinical psychology, concerning the reliability of eyewitness identification. As the majority points out, Cole never testified to having formed an opinion. No issue concerning what evidence might under various circumstances be admissible to support such an opinion is before this Court, and I decline to join in the speculation by the majority concerning such matters. Therefore, I concur only in the result reached by the majority in finding no error in the guilt-innocence phase of the defendant's trial.

More importantly, I disagree with the conclusion by the majority that the trial court's error in instructing the jurors they must be unanimous before finding any mitigating circumstance to exist was not harmless beyond a reasonable doubt. Therefore, I dissent

from the holding of the majority vacating the sentence of death and remanding this case for a new capital sentencing proceeding.

The State concedes that the trial court's instructions to the jury violated the Eighth and Fourteenth Amendments as construed in *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). Since the error is of constitutional magnitude, the State must bear the burden of showing that it was harmless beyond a reasonable doubt. *State v. McKoy*, 327 N.C. 31, 44, 394 S.E.2d 426, 433 (1990); N.C.G.S. § 15A-1443(b) (1988). Contrary to the majority, I believe that the State has borne that burden in the present case.

The majority concludes that the trial court's erroneous unanimity instruction may have prevented a juror from finding the "mental age of the defendant at the time of this murder" to be a mitigating circumstance. Even assuming *arguendo* that this is so, I do not believe the trial court's erroneous instruction was harmful to this defendant. The seven mitigating circumstances *unanimously found* by the jury in the present case included the mitigating circumstances that: (1) the "murder was committed while the defendant was under the influence of mental or emotional disturbance" and (2) "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired." It seems clear beyond any reasonable doubt that the jury gave the defendant the full benefit of any weight his evidence tending to show that he was of low intelligence and functioned at approximately a fourth grade level may have had, when the jury found the above two mitigating circumstances and weighed them in the defendant's favor. The jury would have been required to do no more with this evidence, even had the jury been given proper instructions and followed them. Therefore, I believe the majority errs in vacating the death sentence and awarding a new capital sentencing proceeding in this case on the ground that, absent the *McKoy* error, a juror may have found the "mental age of the defendant at the time of this murder" to be a mitigating circumstance and weighed it in favor of the defendant.

Justice MEYER joins in this concurring and dissenting opinion.