STATE OF NORTH CAROLINA v. JAMES VERNON EASTERLING

No. COA94-999

(Filed 6 June 1995)

1. **Evidence and Witnesses §§ 732, 1256 (NCI4th)— rape— confession—invocation of right to counsel—further question from officer—subsequent statement by defendant**

There was no prejudicial error in a prosecution for multiple counts of rape and sexual offense, and for robbery and kidnapping, where a detective approached defendant in an interview room at police headquarters, stated that he wanted to talk to defendant about an investigation, and advised defendant of his rights; defendant stated that he felt he needed to talk to a lawyer; the detective stopped the interview and informed defendant that he would have to go for his first appearance where the court would appoint an attorney; the detective left the room and returned not more than five or ten minutes later; he informed defendant that officers would be taking him to the magistrate's office to be served with warrants; the detective asked "Who was Sherman"; defendant answered "White"; defendant indicated a few moments later that he wanted to talk about the case; the detective again informed defendant of his rights; defendant indicated that he wanted to go ahead and talk about the case; defendant made and signed an inculpatory statement, including language indicating that the statement was given of his own free will and that he did not want an attorney; and defendant testified at trial, giving testimony that was consistent with his statement. The question "Who was Sherman" constituted an interrogation by police in violation of *Edwards v. Arizona*, 451 U.S. 436, because it was designed to elicit an incriminating response and defendant's statement made only "a few moments" later was nothing more than a continuation of the police-initiated interrogation; however, there was no prejudice because defendant's decision to testify was induced by the strength of the State's case and not by the erroneous admission of defendant's statement.

Am Jur 2d, Appeal and Error §§ 797-801, 803; Criminal Law §§ 788 et seq; Evidence §§ 749, 750.

Comment Note.—Necessity of informing suspect of rights under privilege against self-incrimination, prior to police interrogation. 10 ALR3d 1054.

STATE v. EASTERLING

[119 N.C. App. 22 (1995)]

What constitutes "custodial interrogation" within rule of *Miranda v. Arizona* requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.

What constitutes assertion of right to counsel following *Miranda* warnings—state cases. 83 ALR4th 443.

Necessity that *Miranda* warnings include express reference to right to have attorney present during interrogation. 77 ALR Fed. 123.

Supreme Court's views as to what constitutes valid waiver of accused's federal constitutional right to counsel. 101 L. Ed. 2d 1017.

2. **Jury § 260 (NCI4th)— rape—jury selection—peremptory challenges—not racially discriminatory**

Defendant's *Batson* challenge in a rape prosecution was properly denied where the State voluntarily proffered explanations for its peremptory challenges of African-American jurors, so that the Court did not need to address the trial court's conclusion that defendant failed to make a prima facie case of discrimination and could proceed as if defendant had met his burden; the State explained that it was looking for a certain type of juror with a family, a job that had been maintained for a substantial amount of time, and roots in the community; and none of the jurors excused by the State had the employment or family history which the State was seeking.

Am Jur 2d, Jury §§ 235, 244.

Jury: membership in racially biased or prejudiced organization as proper subject of voir dire inquiry or ground for challenge. 63 ALR3d 1052.

Racial or ethnic prejudice of prospective jurors as proper subject of inquiry or ground of challenge on voir dire in state criminal case. 94 ALR3d 15.

Use of peremptory challenges to exclude ethnic and racial groups, other than black Americans, from criminal jury—post-*Batson* state cases. 20 ALR5th 398.

Use of peremptory challenges to exclude ethnic and racial groups, other than black Americans, from criminal jury—post-*Batson* federal cases. 110 ALR Fed. 690.

STATE v. EASTERLING

[119 N.C. App. 22 (1995)]

3. **Rape and Allied Sexual Offenses § 151 (NCI4th)— first-degree rape—serious personal or bodily injury—instructions**

The trial court did not err in a first-degree rape prosecution by failing to give defendant's specific written request for an instruction on serious personal injury where the instruction given accurately reflects the applicable law. Under *State v. Boone*, 307 N.C. 198, in order for a mental injury to constitute serious personal injury and elevate second-degree rape and second-degree sexual offense to first-degree, the mental injury must be more than the *res gestae* present in every forcible rape and sexual offense and the State must ordinarily offer proof that such injury was not only caused by the defendant but extended for some appreciable time beyond the incidents surrounding the crime itself. However, *Boone* does not place an additional burden on the State to show that a mental injury must be more than that normally experienced in every forcible rape in addition to showing that the mental injury extended for some appreciable time. If a mental injury extends for some appreciable time, it is therefore a mental injury beyond that normally experienced in every forcible rape.

**Am Jur 2d, Rape §§ 108 et seq.**

**Propriety of, or prejudicial effect of omitting or of giving, instruction to jury, in prosecution for rape or other sexual offense, as to ease of making or difficulty of defending against such a charge. 92 ALR3d 866.**

4. **Kidnapping and Felonious Restraint § 18 (NCI4th)— kidnapping—facilitating robbery—evidence sufficient**

The evidence was sufficient to support first-degree kidnapping for the purpose of facilitating robbery where the State's evidence tended to show that defendant got in the victim's car and began choking her with both hands; he pulled her back in the car when she tried to escape and then dragged her by her hair over the stick shift and out the other side of the car and across the gravel parking lot to an accomplice's car; the accomplice went through the victim's pocketbook while she was in his car; and defendant stole her jewelry. These acts constituted neither a mere technical asportation nor an inherent and integral part of the robbery.

**Am Jur 2d, Abduction and Kidnapping § 32.**

STATE v. EASTERLING

[119 N.C. App. 22 (1995)]

What is "harm" within provisions of statutes increasing penalty for kidnapping where victim suffers harm. 11 ALR3d 1053.

Seizure or detention for purpose of committing rape, robbery, or similar offense as constituting separate crime of kidnapping. 43 ALR3d 699.

5. **Rape and Allied Sexual Offenses § 173 (NCI4th)— second-degree sexual offense—evidence sufficient**

The trial court did not err in denying defendant's motion to dismiss a charge of second-degree sexual offense for insufficient evidence where the victim testified that defendant made her perform oral sex on him but that she gagged herself so he would let her stop and that defendant forced her head down and made her place her mouth around his penis and then she tried to throw up.

**Am Jur 2d, Rape §§ 108 et seq.**

6. **Criminal Law §§ 1113, 1120 (NCI4th)— rape, kidnapping, and robbery—sentencing—conduct during pretrial confinement—impact of crime on victim and society—court's comments not a nonstatutory aggravating factor**

There was no error in a sentencing hearing for first-degree rape, first and second-degree sexual offense, first-degree kidnapping, and robbery where the court, before sentencing defendant, noted defendant's disruptive conduct during pretrial confinement and trial and the especially destructive effect of the crimes on the victim, her parents, other women, and the fabric of society, but went on to state that it considered only the evidence in sentencing defendant. The court's comments indicate that it did not consider or apply defendant's disruptive conduct or the effects of the crime as nonstatutory aggravating factors.

**Am Jur 2d, Criminal Law §§ 612, 613.**

Appeal by defendant from judgments entered 21 February 1994 in Guilford County Superior Court by Judge W. Douglas Albright. Heard in the Court of Appeals 18 April 1995.

*Attorney General Michael F. Easley, by Assistant Attorney General Valerie B. Spalding, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Gordon Widenhouse, for defendant-appellant.*

GREENE, Judge.

James Vernon Easterling (defendant) appeals from judgments and commitments entered after a jury convicted him of eight counts of first-degree rape, six counts of first-degree sexual offense, one count of second-degree sexual offense, three counts of first-degree kidnapping, and one count of common law robbery during the 15 February 1993 Mixed Session of Guilford County Superior Court. Judge W. Douglas Albright imposed fourteen consecutive life sentences for the first-degree rapes and first-degree sexual offenses, a concurrent forty year sentence for first-degree kidnapping, and a concurrent ten year sentence for common law robbery. Judge Albright arrested judgment on the remaining two kidnapping convictions.

The indictment for the first count of first-degree kidnapping against defendant provided that defendant confined the victim in a motor vehicle "for the purpose of facilitating the commission of the felony of Robbery . . . . The victim . . . was not released in a safe place .by the Defendant, but was taken away from the scene of the abduction."

On 14 February 1994, defendant filed a motion to suppress oral admissions and a written statement made by defendant to law enforcement officers while in custody. In this motion and defendant's affidavit supporting the motion, defendant alleged that those statements, "were not freely and voluntarily made but were coerced and were the result of persistant [sic] and repeated interrogations by numerous skillful law enforcement officers and in the absence of counsel and without an intelligent or knowing waiver of counsel."

At the voir dire hearing on defendant's motion, Detective J.F. Whitt (Detective Whitt) testified that he approached defendant in an interview room at police headquarters, stated he "wanted to talk to him about the investigation that was currently underway," and verbally advised him of his rights as required under *Miranda v. Arizona*. Detective Whitt testified that after he had read defendant his rights, and defendant had initialed and signed the form listing these rights, defendant "indicated at that point that he felt like that he needed to talk to a lawyer." Detective Whitt stopped the interview at that point and informed defendant that although he could not appoint him an attorney, defendant "would have to go for his first appearance through the court process" where the court would appoint an attorney for him.

Detective Whitt left the room, and when he returned not more than five or ten minutes later, he informed defendant "that the officers would be taking him across to the magistrate's office to formally be served with the warrants. At that point, . . . I made the comment, 'Who was Sherman?' And he indicated just shortly thereafter, 'White.' And just a few moments later he indicated that he wanted to go ahead and talk to me about the case." Detective Whitt therefore informed defendant again of his rights, "that the rights had been read to him, and that he understood them; that the waiver of rights, that I had marked on there that he had refused. I informed him, you know, if he wanted an attorney that we would make every effort to assist him in locating one by providing him with a phone to do that. At which time, he indicated he wanted to go ahead and talk with me about the case." At the conclusion of the interview, defendant signed his statement which also contained the following: "I am giving this statement of my own free will. I have not been promised or threatened in any way or been made to give this statement. I do not want a lawyer present with me during the time I spoke with Detective Whitt."

By order dated 17 February 1994, the trial court found in pertinent part that Detective Whitt gave *Miranda* warnings to defendant which he indicated he understood, defendant invoked his right to counsel, and Detective Whitt ceased the interrogation. Subsequently, Detective Whitt asked defendant "Who Sherman was" and defendant responded "White":

18. Some further appreciable time elapsed and the officers started to take the defendant to the magistrate's office. Whereupon, the defendant indicated to the officer in no uncertain terms that he wanted to talk to him without a lawyer present and said, "he wanted to talk." Officer Whitt responded, "Are you sure?" The defendant made it abundantly clear that he was. At this point, Detective Whitt readvised the defendant of all of his constitutional rights as required by the Miranda decision as he gave before . . . . The defendant again acknowledged his awareness and understanding of each of these rights and reaffirmed his desire to talk to the officer without a lawyer present by signing the Waiver of Rights. The defendant acknowledged in writing that he had read the statement of rights and had his rights explained to him by a police officer, and that knowing these rights he did not want a lawyer at this time. The defendant waived those rights knowingly and willingly agreed to answer questions and/or make a statement;

19. The defendant affirmatively, understandingly, knowingly and voluntarily waived his right to the presence of counsel, retained or appointed, during questioning in writing;

20. . . . Under the totality of the circumstances, it is clear that this defendant wanted to talk to the officer without a lawyer present and wanted to do so then and there before being taken to the magistrate's office by the officers . . . .

Based upon these findings, the court concluded "defendant's statement was freely, voluntarily, understandingly and knowingly made without coercion, duress, threat or intimidation" and therefore denied his motion to suppress; however, the court ordered "that the question by Detective Whitt to the defendant to the effect 'Who is Sherman?' and the defendant's answer, 'White,' be" suppressed.

During jury selection, the prosecutor, Mr. Panosh, exercised three of his six peremptory challenges to exclude three of the five African-Americans called into the jury box, and defendant's counsel, Mr. Jennings, made a motion for a mistrial based upon *Batson v. Kentucky* that Mr. Panosh had exercised his peremptory challenges in a racially discriminatory manner. Mr. Panosh explained why he exercised three peremptory challenges against prospective African-American jurors:

MR. PANOSH: . . . We would submit that he has not set forth a prima facie—sufficient evidence to show a prima faci[e] case of discrimination. However, for the record, juror No. 4, Sherman Hughes was a black male, appeared to be young, in his early twenties, . . . he is a shipping clerk for Odell Hardware, that he's worked there for less than a year, that his prior occupation was janitorial staff, he worked there for less than three years, and that he was single. Based upon what I saw of him and the answers to those questions, I determined that he was not the type of juror that I was seeking. I was seeking a juror who was from the mainstream of our community, who was employed for a substantial period of time, had a family and had roots in the community.

Juror No. 6, Edith Allred, indicated that she was also single, that she had worked for the coliseum for three months, that before that her occupation was B&B Temporary Services. Again, this juror did not fit the profile of the type of juror that I was looking for, a person who was employed for a substantial period of time, and who had roots in the community, and was a family individual.

**STATE v. EASTERLING**

[119 N.C. App. 22 (1995)]

Juror No. 12, Selena Hampton, indicated that she was a student at A&T, studied English, she was not employed, and that she was single. Again, this juror did not fit the profile I was looking for. She was not from the mainstream of our community. She was not employed in a steady occupation, was not married, was not the type of person that I was looking for who could listen to the evidence in this particular case and come to a rational conclusion.

The court, in denying defendant's motion, found that defendant "has failed to make out any prima facie showing that the district attorney discharged jurors in a racially discriminatory manner or for racially discriminatory purposes," "the exercise of the peremptory challenges by the State rested upon racially neutral reasons, and upon an articulable basis set forth by the district attorney that is racially neutral in nature," none of the questions of Mr. Panosh "were protectional or designed to eliminate black jurors for racially discriminatory reasons," and "at this time two black females remain upon the panel." The final jury consisted of two African-American females, six white females, and four white males.

At trial, the alleged victim (Elizabeth), a college student, testified for the State as to the following: On 14 April 1993, she left her part-time job at Bennigan's restaurant in Greensboro just before 2:30 a.m. As she was stopped at a red light at the intersection of Chapman and Spring Garden, a car that had been following her "just plowed right into" her car. Elizabeth pulled over into a parking lot of a hair shop, rolled down her window, and kept her car running while the other car came into the parking lot. She saw defendant get out of the other car and come up to her side window. He reached through the window and punched her in the jaw. The punch must have knocked her unconscious, and when she regained consciousness, defendant was in her car choking her with his hands around her throat.

Elizabeth "tried to get out on the passenger's side and run, and [defendant] pulled [her] back in by [her] hair." After a while, defendant pulled Elizabeth by her hair out of her car, across the gravel parking lot on which she hit her hands, bottom and legs, and put her into the back seat of the car that ran into her car. Sherman White (White) was sitting in the front seat and had Elizabeth's pocketbook. "[T]hey were going through [her] pocketbook to see how much money [she] had, and meanwhile [defendant] was taking off [her] jewelry." Defendant was in the back seat with Elizabeth and continued to hit

her. Defendant took Elizabeth's paycheck out of the front right-hand pocket of her shorts. Both men stated they would kill her if she did not "shut up" and keep her head down. While in the back seat of the car, defendant, "[a]t least four" times, stuck his finger in Elizabeth's vagina and fondled both of her breasts "[t]wo or three times." Both men wanted to take Elizabeth to Kroger's to cash her paycheck but decided she was too upset.

After this discussion about Kroger's, defendant said to White to take Elizabeth to Heath Park. Defendant and White tied Elizabeth's hands behind her back. Once they arrived at the park, defendant pulled her out of the car and down a hill where she was thrown to the ground. The men then used her suspenders to tie her legs, and "kept violently pushing [her] head down so that [she] wouldn't look at them." The men discussed what to do with Elizabeth, and defendant "wanted to kill [her]. He was the one who definitely wanted [her] gone." The men untied her, "threw" her into the car, and took her to another park.

At the other park, defendant pulled Elizabeth out of the car and down a hill while White followed them. Defendant then "took off [her] clothes and he threw [her] on the ground and he raped" her. At the same time, White was trying to make her perform oral sex on him. White then raped Elizabeth while defendant rubbed his penis on her bottom. Both men put their tongues in her vagina before they had intercourse with her. Defendant threw Elizabeth back into the car, and Sherman drove them somewhere. Defendant then dragged Elizabeth out of the car, through some back yards and to a house. When defendant could not open the door to the house, he hid Elizabeth in an old car, knocked on the front door of the house, and his mother opened it. Defendant ran back and got Elizabeth and carried her through the house and told her to "not say a word." Sherman had left.

Defendant took Elizabeth to his bedroom and raped her on the bed. He put his tongue in her vagina both before and during the sexual intercourse. She noticed a horseshoe-shaped scar on defendant's left arm. Defendant placed Elizabeth on the floor and raped her again. He also placed his tongue in her vagina both before and during this sexual intercourse. Defendant made Elizabeth hide under the bed while his mother left for work. Elizabeth did not scream or cry out because she was afraid defendant would kill her. After defendant's mother left, defendant took Elizabeth to a back bedroom that was

blue and raped her on the bed. Defendant put his tongue in her vagina both before and during this sexual intercourse. "[It] was light at that time. . . . [She] had seen [defendant's] face by then, but [she] kept [her] eyes covered." Defendant then took Elizabeth to the front room, and raped her again on the couch and put his tongue in her vagina.

Sherman came to the house, and he and defendant discussed what to do with Elizabeth, and she pleaded for them not to kill her. Sherman and defendant went to the back blue bedroom to watch television, and they made Elizabeth "sit on the bed in there and watch" television. They were waiting to see if Elizabeth appeared on the news. Sherman left to get some food. Defendant then made her take a shower and douche. Afterwards, "he made [her] perform oral sex on him, but [she] gagged [her]self so he would let [her] stop. . . . He forced [her] head down and made [her] place [her] mouth around his penis, and then [she] proceeded to try and throw up." Defendant raped Elizabeth on the bed and put his tongue in her vagina. Defendant ejaculated which he had not done on any of the previous rapes of Elizabeth. He then said he was going to kill her and choked her until she lost consciousness.

Sherman came back. He and defendant gave Elizabeth clothes to wear and sunglasses and told her they were going to let her go. Defendant wiped off her wallet, credit cards and ATM card, and gave her the wallet, her watch, and a quarter so she could make a phone call. They dropped her off in the back parking lot of a hotel, and she ran to the hotel's front office and called her landlord. He and one of Elizabeth's roommates picked her up at the hotel. Elizabeth met with the Greensboro police and was examined at a hospital. She identified for the jury photographs of her car, her jewelry, the locale where defendant had first attacked her, the car which Sherman and defendant were driving, the two parks, defendant's house and rooms of that house, and her injuries. She identified defendant in court, and the horseshoe-shaped scar on his arm was shown to the jury. She stated she heard defendant call the other perpetrator "Sherman."

Defendant's statement to Detective Whitt was introduced at trial. In the statement, defendant stated he and White rammed Elizabeth's car, defendant took Elizabeth and put her in White's car, and they took her to a park where both of them sexually assaulted her and had sexual intercourse with her. Defendant stated they took Elizabeth to defendant's house and kept her there until the next day, at which time they took her to a motel parking lot and let her go. The statement did

not contain anything about sexual assaults on Elizabeth when at defendant's parents' house.

Carl Allen, Jr. (Allen), a physician's assistant accepted as an expert in the field of emergency medicine, testified for the State that he was on duty when Elizabeth came in on 15 April 1993. She told Allen what had happened, and he related this to the jury. Upon giving Elizabeth a physical examination and obtaining samples for a rape kit, Allen found that Elizabeth's throat was red, and she had bruises on her throat, left shoulder, both sides of her rib, and her left lower thigh, and an abrasion on her right arm and some on her vertebrae. Her vaginal area was very tender, and nonmodal sperm were present on Elizabeth's vaginal swabs. Allen stated that in his opinion, Elizabeth had sexual intercourse in the hours before he examined her, and she had suffered severe bodily trauma.

Special Agent David Mishoe (SA Mishoe), accepted as an expert in the field of latent fingerprinting, testified he found a palm print behind the driver's door of Elizabeth's car which, in his opinion, matched defendant. He examined White's car and found a print which matched defendant.

Special Agent Peter Deaver (SA Deaver), accepted as an expert in the field of forensic serology, testified that he analyzed the items in the sexual assault kit taken from Elizabeth and her clothing and found spermatozoa on Elizabeth's panties and shorts and on her vaginal swabs.

Special Agent Michael Budzynski (SA Budzynski), accepted as an expert in the field of DNA comparison and analysis, explained the procedure involved in DNA comparison and analysis to the jury. He then testified that the DNA profile obtained from the male fraction of deposit on Elizabeth's shorts matched the DNA profile obtained from defendant's blood sample. SA Budzynski stated that the probability of finding another individual with the same DNA profile was "one in more than [5.5] billion for the North Carolina white population, one in [430] million for the North Carolina black population, and one in [5] billion for the North Carolina Lumby [sic] Indian population."

At the close of the State's evidence, defendant moved to dismiss count four, the charge of first-degree sexual offense of forcing Elizabeth to engage in fellatio against her will with defendant. The State conceded this charge "should be submitted to the jury on second degree sexual offense, because all the evidence indicates that at

STATE v. EASTERLING

[119 N.C. App. 22 (1995)]

the time the fellatio occurred, Mr. Sherman White was not present and no deadly weapon was used." The court therefore ordered count four to be a charge of second-degree sexual offense and denied defendant's motion to dismiss. At the close of all the evidence, defendant moved to dismiss two of the three kidnapping charges against defendant "being the defendant's position that there was only one kidnapping." The court denied this motion.

Defendant stated he wished to testify even though his counsel strongly advised him not to. On direct examination, defendant stated "the reason for my sitting here was to say yeah, part of this case I'm guilty of. But there's a great portion of it that I'm not. And that's the reason I'm sitting here is for the part that I'm not guilty of. The first part of this case, yes, I'm guilty of it and I apologize for it. . . . And as a result, I have to pay. I have no problem with that. But the rest of this, the part at my house—and I'll go past the rest of this because that's the part that I came here to testify about." Defendant admitted his involvement in the "first part of the case," referring to the ramming of Elizabeth's car, taking her to the park, and sexually assaulting her there, but denied assaulting her at his parents' house. He acknowledged he "did have sex with her" at his house, but claimed it was not "under force." On cross-examination, however, he answered some questions but refused to answer others. After being admonished by the court to answer, defendant then refused to answer any more questions on cross-examination. At the request of the State, cross-examination was terminated, and the court ordered the testimony to stand as is.

On rebuttal for the State, Elizabeth's sister testified that she and her husband took Elizabeth to stay with them immediately after the attack because Elizabeth was afraid defendant would kill her and her family. The sister stated Elizabeth is still afraid of retaliation from defendant and White and will not stay in Greensboro. Elizabeth stayed with her sister for about six to eight weeks after the attack, at which time Elizabeth transferred to a school in Wilmington. During the time she stayed with her sister, Elizabeth would not go out in public by herself, refused to sleep alone, had nightmares, took medication to help her sleep, sought help from a psychiatrist and a group specializing in counseling for sexual assault victims, would not drive anywhere by herself, and refused to be left alone. The sister stated she has kept in close contact with Elizabeth and knows she still has symptoms. For example, Elizabeth has "not driven by herself until this past December" and "the weekends her roommates have gone . . .

somebody has had to drive to Wilmington or she's had to drive from Wilmington with somebody to pick her up, because she's scared to stay by herself."

The transcript of the trial proceedings before this Court contains the following exchange:

(Closing argument on behalf of the defendant by Mr. Jennings)

(During Mr. Jennings' argument, Mr. Panosh objected to comments made by Mr. Jennings about mandatory life imprisonment; both counsel approached the bench; the objection was sustained.)

After the closing arguments, the court instructed the jury. In its instruction to the jury on first-degree rape, the court stated:

I further instruct you that proof of the element of infliction of serious personal injury may be met by showing of mental injury as well as bodily injury. I must tell you, however, and so charge you, that in order to support a jury finding of serious personal injury, because of injury to the mind or a nervous system, the State must offer proof that such injury was not only caused by the defendant, but that the injury extended through some appreciable time beyond the incidents surrounding the crime itself.

The trial court instructed the jury that to find defendant guilty of first-degree kidnapping, the State must prove beyond a reasonable doubt:

[F]irstly, that the defendant unlawfully confined the person. That is, imprisoned her within a given area.

Secondly, the State must prove that the person did not consent to this confinement. . . .

Thirdly, the State must prove that the defendant confined that person for the purpose of facilitating his commission of robbery. . . .

Fourthly, the State must prove that this confinement was a separate, complete act, independent of and apart from the robbery.

And finally, members of the jury, the State must prove that the person so confined was either not released by the defendant in a safe place or had been sexually assaulted.

After the court gave its charge to the jury, the court heard requests for corrections or additional matters to the charge. Defendant requested in writing a specific instruction from *State v. Boone,* 307 N.C. 198, 297 S.E.2d 585 (1982) "that proof of an element of infliction of serious personal injury, as required by G.S. 14-27.22(b) and G.S. 14-27.42(b), may be met by the showing of mental injury as well as bodily injury, but this must be more than the results present in any forcible rape or sexual offense." The court denied defendant's instruction request because it had given the "substance" of the requested instruction.

At defendant's sentencing hearing, the court, before sentencing defendant, noted defendant's disruptive and assaultive conduct in pretrial confinement, including his being charged with possession of a weapon in the local jail and his attempt to escape, defendant's disruptive conduct during trial, including cursing both the district attorney and his own counsel and glowering at and intimidating the prosecuting witness, and defendant's "manifestly contemptuous and disrespective" behavior towards the court. The court then stated:

> I dare say that no parents should have to see or have to hear what these parents' eyes have seen and heard. I dare say the Court has no real way to measure the devastating impact the matters and circumstances described in this testimony have had, and I would not attempt to speculate and will not sentence the defendant on speculation in that respect. But I dare say they want to know, as I think most folks want to know, can brutal rape be punished? Is there any strength left in our law? Are any of our women safe? Have we lost our will to punish criminal violence? Do we have the resolve to resist criminal violence? Or are we simply helpless?

The court also noted the unspeakable violence and atrocities revealed by Elizabeth's testimony "too sor[did] to be repeated in civilized society."

The court then stated "I limit my consideration on the question of punishment to the matters in evidence before the Court." The court took into account defendant's criminal history as an aggravating factor and gave the defendant "credit as a mitigating factor that he made that statement at an early stage, even though he now repudiates that statement." The court also found "as a nonstatutory factor that he identified the codefendant at an early stage." In imposing defendant's sentence, the court found that factors in aggravation substantially outweigh any factors in mitigation.

The issues presented are whether (I) defendant's confession was illegally obtained and therefore erroneously admitted; (II) the State's exercise of three peremptory strikes against potential jurors of African-American descent violated defendant's constitutional right to a jury selected without regard to race; (III) defendant was entitled to have the jury instructed on his requested definition of serious personal injury; (IV) the evidence was sufficient to support a conviction for kidnapping; (V) the evidence was sufficient to support a conviction for second-degree sexual offense; and (VI) defendant is entitled to a new sentencing hearing where the trial court noted defendant's conduct during pretrial confinement and trial and the destructive effect of his crimes on other women and society.

I

[1] Defendant's first argument is that "the question posed to defendant as to [the] identity of Sherman was reasonably likely to result in" incriminating statements, i.e., the answer to this question and defendant's subsequent confession to Detective Whitt, therefore violating defendant's constitutional right to counsel and entitling him to a new trial.

Once an accused has invoked his right to counsel, "the interrogation must cease until an attorney is present," *Miranda v. Arizona*, 384 U.S. 436, 474, 16 L. Ed. 2d 694, 723, *reh'g denied by California v. Stewart*, 385 U.S. 390, 17 L. Ed. 2d 121 (1966), and "a valid waiver of that right cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484, 68 L. Ed. 2d 378, 386, *reh'g denied*, 452 U.S. 973, 69 L. Ed. 2d 984 (1981). Once the interrogation is ceased after defendant's invocation of the right to counsel, it can only be recommenced under two sets of circumstances: (1) "reinitiation of conversation by defendant and a knowing and intelligent waiver of the right to counsel by defendant"; and (2) "police-initiated interrogation *once counsel is present*." *State v. Morris*, 332 N.C. 600, 610, 422 S.E.2d 578, 584 (1992); *see also Minnick v. Mississippi*, 498 U.S. 146, 112 L. Ed. 2d 489 (1990). This rule from *Edwards* and its progeny is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights," *Michigan v. Harvey*, 494 U.S. 344, 350, 108 L. Ed. 2d 293, 302 (1990), "ensures that any statement made in subsequent interrogation is not the result of coercive pressures," *Minnick*, 498 U.S. at 151, 112 L. Ed. 2d at 496, and provides " 'clear and unequivo-

cal' guidelines to the law enforcement profession." *Arizona v. Roberson*, 486 U.S. 675, 682, 100 L. Ed. 2d 704, 714 (1988).

We initially note that the question "Who was Sherman," because it was designed to elicit an incriminating response, constituted an interrogation by the police in violation of *Edwards*; therefore, the trial court properly suppressed Detective Whitt's question, "Who was Sherman" and defendant's subsequent response, "White." *See State v. Washington*, 330 N.C. 188, 410 S.E.2d 55 (1991) (interrogation occurs when objective observer with same knowledge of suspect as police officer would, on sole basis of hearing officer's remarks, infer remarks were designed to elicit incriminating response). The question then is whether defendant's subsequent statement made only "a few moments" later that he wanted to talk to the police was a "reinitiation of conversation by defendant" within the meaning of *Edwards*. We do not believe so. As noted, *Edwards* was designed to ensure against "coercive pressure," and the lapse of "a few moments" between illegal police-initiated interrogation and the request of a defendant to talk is not sufficient to dissipate the effect of the "coercive pressure." In this event, the defendant's request to talk is nothing more than a continuation of the police-initiated interrogation. Defendant's confession was therefore illegally obtained, and the trial court erred in admitting the confession. Although this erroneous admission involves a constitutional violation, a new trial is not required if the State can demonstrate that the error was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1988); *Morris*, 332 N.C. at 610, 422 S.E.2d at 584.

Defendant argues that the State can meet this burden only if it can show that his subsequent decision to testify at trial was not induced by admission of his confession. The United States Supreme Court has held that "the same principle that prohibits the use of confessions [illegally] procured also prohibits the use of any testimony impelled thereby—the fruit of the poisonous tree." *Harrison v. United States*, 392 U.S. 219, 222, 20 L. Ed. 2d 1047, 1051 (1968). The burden is on the State to show that the introduction of the illegally obtained confession did not induce the defendant's subsequent testimony at trial in that the "testimony was obtained 'by means sufficiently distinguishable' from the underlying illegality 'to be purged of the primary taint.' " *Id.* at 226, 20 L. Ed. 2d at 1053. The *Harrison* Court therefore determined that where a defendant has been "induced" at a former trial to testify by the prosecution's introduction in evidence of unlawfully obtained confessions, his testimony, so

induced, may not be admitted in evidence against him at a retrial on the same charge over his objection upon the ground that it was so induced. *Id.* Our Supreme Court, however, determined that where an unconstitutionally obtained confession is introduced in evidence over defendant's objection, the error is cured when the defendant takes the stand in his own behalf at the same trial and testifies to the same facts in the confession, the State having introduced ample evidence apart from that erroneously admitted and the defendant having failed to claim his testimony was impelled by the trial court's errors. *State v. McDaniel*, 274 N.C. 574, 578-84, 164 S.E.2d 469, 471-75 (1968). Under those circumstances, the Court determined there is no violation of *Harrison* because the defendant's testimony was induced by the strength of the State's evidence and not by the erroneous admission of his confession. *Id.*

As in *McDaniel*, it is unrealistic to suppose that, confronted with the overwhelming evidence against him introduced by the State at trial, defendant was "induced" to testify solely because of the introduction of his confession. Furthermore, at no time in the trial court did the defendant or his counsel argue that his testimony was "induced" by the introduction of his confession or that defendant changed his trial strategy as a result of the error in admitting his confession. In addition, defendant's statement did not contain any "confession" concerning sexual assaults at his parents' house, he admitted to the Court he was guilty of the crimes of sexual assault that occurred at the park, and stated that he wished to testify only to deny · the State's evidence that he had committed any crimes while he was at his parents' house. Therefore, his testimony at trial was consistent with his statement. We are satisfied that defendant's decision to testify in this case was induced by the strength of the State's evidence and not by the erroneous admission of defendant's statement. Therefore, the State has met its burden of showing that the erroneous admission of defendant's illegally obtained confession constituted harmless error.

## II

[2] Defendant also argues his "constitutional right to a jury selected without regard to race was violated by the prosecutor's discriminatory use of peremptory strikes against potential jurors of African-American descent." We disagree.

Because the State voluntarily proffered explanations for its peremptory challenges of African-American jurors, we need not

address the trial court's conclusion that defendant failed to make a prima facie case of discrimination and proceed as if defendant had met his burden. *State v. Robinson*, 330 N.C. 1, 17, 409 S.E.2d 288, 297 (1991).

> In order to rebut a prima facie case of discrimination, the prosecution must "articulate legitimate reasons which are clear and reasonably specific and related to the particular case to be tried which give a neutral explanation for challenging jurors of the cognizable group." These reasons " 'need not rise to the level justifying exercise of a challenge for cause.' " "So long as the motive does not appear to be racial discrimination, the prosecutor may exercise peremptory challenges on the basis of 'legitimate hunches and past experience.' " "Since the trial judge's findings . . . will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." [Citations omitted.]

*Id.* In this case, the State indicated that it "was seeking a juror who was from the mainstream of our community, who was employed for a substantial period of time, had a family and had roots in the community." The State explained that it exercised three of its peremptory challenges to exclude three of five African-American potential jurors because none of them "fit the profile" and were not the type of juror the State was seeking. The State explained that Juror No. 4 was a young single male who had worked at his current employment for less than a year, Juror No. 6 was a single female who had worked at her current employment for three months and worked for a temporary service before her current job, and Juror No. 12 was a single female unemployed college student.

Following the general principles established in *Robinson*, the State has met its burden of proffering neutral, nonracial explanations for each peremptory challenge. The State explained it was looking for a certain type of juror with a family, a job that had been maintained for a substantial amount of time, and roots in the community. None of the three jurors excused by the State had the employment history or family which the State was seeking. For these reasons, defendant's *Batson* challenge is denied.

### III

[3] Defendant next contends that the trial court erred in denying his written request for "a specific instruction that any serious personal or

bodily injury that would elevate a second degree rape or sexual offense to first degree rape or sexual offense 'must be more than the results present in every forcible rape and sexual offense.'" We disagree.

Our General Assembly has determined that second-degree rape and second-degree sexual offense are elevated to the first degree if serious personal injury is inflicted. N.C.G.S. § 14-27.2 (first-degree rape); N.C.G.S. § 14-27.3 (second-degree rape); N.C.G.S. § 14-27.4 (first-degree sexual offense); N.C.G.S. § 14-27.5 (second-degree sexual offense). Our Supreme Court determined that in order for a mental injury to constitute "serious personal injury," the mental injury "must be more than the *res gestae* results present in every forcible rape and sexual offense. . . . [T]he State must ordinarily offer proof that such injury was not only caused by the defendant but that the injury extended for some appreciable time beyond the incidents surrounding the crime itself." *Boone*, 307 N.C. at 205, 297 S.E.2d at 590. We do not read *Boone* as placing an additional burden on the State to show a mental injury must be more than that normally experienced in every forcible rape in addition to showing the mental injury extended for some appreciable time, as defendant suggests. Rather, we read *Boone* as holding that if a mental injury extends for some appreciable time, it is therefore a mental injury beyond that normally experienced in every forcible rape. *See id*, 307 N.C. at 205, 297 S.E.2d at 590 (because only evidence of rape victim's condition was that she was hysterical in morning hours of day crime was committed, and no evidence of residual injury after morning of crime, insufficient evidence for serious personal injury); *State v. Baker*, 336 N.C. 58, 65, 441 S.E.2d 551, 555 (1994) (serious mental injury where rape victim's depression, loss of appetite and weight, counseling, nightmares, and insomnia continued for twelve months after rape); *State v. Davis*, 101 N.C. App. 12, 23, 398 S.E.2d 645, 652 (1990) (serious personal injury where victim suffered from physical pain, appetite loss, severe headaches, nightmares, and difficulty sleeping lasted for at least eight months), *appeal dismissed & disc. rev. denied*, 328 N.C. 574, 403 S.E.2d 516 (1991); *State v. Mayse*, 97 N.C. App. 559, 563-64, 389 S.E.2d 585, 587 (serious mental injury where victim's mental and emotional injuries continued for at least seven months after rape; victim quit work, quit school, moved from home, sought professional help), *disc. rev. denied*, 326 N.C. 803, 393 S.E.2d 903 (1990). Because the trial court's instruction accurately reflects the applicable law regarding "serious personal injury" as established by *Boone*, the trial court's charge on

"serious personal injury" was adequate, and the court did not err in failing to give defendant's specific written instruction request. *State v. Bogle*, 90 N.C. App. 277, 283, 368 S.E.2d 424, 428 (1988), *rev'd on other grounds*, 324 N.C. 190, 376 S.E.2d 745 (1989).

IV

[4] Defendant further challenges the sufficiency of the evidence to support the first-degree kidnapping conviction.

Kidnapping is "unlawfully confin[ing], restrain[ing], or remov[ing] from one place to another, any other person 16 years of age or over without the consent of such person" for the purpose of committing or facilitating the commission of certain specified acts. N.C.G.S. § 14-39(a) (1993). The only kidnapping conviction before this Court is based on kidnapping Elizabeth "for the purpose of facilitating the commission of the felony of Robbery." The other two judgments of first-degree kidnapping, one "for the purpose of facilitating the commission of the felonies of Rape or Sex Offense" and the other "for the purpose of facilitating the commission of the felonies of Rape, or Sex Offense, or Murder," were arrested by the trial judge.

Defendant argues there was no confinement separate from the robbery and relies on *State v. Irwin*, 304 N.C. 93, 282 S.E.2d 439 (1981), in which our Supreme Court concluded that a "removal" which is an integral and inevitable part of some crime other than the kidnapping will not support a separate conviction for kidnapping. *Id.* at 103, 282 S.E.2d at 446.

In *Irwin*, defendant, in an armed robbery of a store, forced a clerk at knife point from the front to the back of the store to open a safe. The Court held that this was a "mere technical asportation" and "an inherent and integral part of the attempted armed robbery" which would not support a separate conviction for kidnapping. *Id.* "The key principle governing whether a kidnapping charge will lie, as expressed in *Irwin*, is whether '[u]nder such circumstances [the victim] is . . . exposed to greater danger than that inherent in the armed robbery itself, . . . [or] is . . . subjected to the kind of danger and abuse the kidnapping statute was designed to prevent.' " *State v. Tucker*, 317 N.C. 532, 535-36, 346 S.E.2d 417, 419 (1986) (*quoting Irwin*, 304 N.C. 93, 282 S.E.2d 429).

Similar to our Supreme Court in *Tucker*, we find *Irwin* distinguishable. The State's evidence tended to show defendant got in Elizabeth's car and began choking her with both hands. Defendant

pulled her back in the car when she tried to escape and then dragged her by her hair over the stick shift and out the other side of the car and across the gravel parking lot to White's car. While in White's car, White went through Elizabeth's pocketbook, and defendant stole her jewelry. These acts constituted neither a "mere technical asportation" nor "an inherent and integral part of the" robbery committed, and the evidence is therefore sufficient to support defendant's conviction of first-degree kidnapping.

Defendant also argues that the trial court improperly instructed the jury on the charge of first-degree kidnapping; however, because there is no assignment of error corresponding to the issue presented, we do not consider this matter. *State v. Thomas*, 332 N.C. 544, 554, 423 S.E.2d 75, 80 (1992); N.C. R. App. P. 10(a) (scope of appellate review is limited to those issues presented by assignment of error).

V

**[5]** Defendant also argues the trial court erred in denying the motion to dismiss the second-degree sexual offense charge because "[a]t no time did [Elizabeth] testify that defendant attempted to have her commit fellatio with him"; therefore, "the evidence simply did not support the charge in this indictment." We disagree.

One of the many indictments against defendant for first-degree sexual offense included a count of fellatio. At the charge conference, this charge was reduced to second-degree sexual offense because defendant acted alone. N.C.G.S. § 27.5 (second-degree sexual offense). In ruling on a defendant's motion to dismiss, the trial court, examining the evidence in the light most favorable to the State and giving the State every reasonable inference and intendment that can be drawn from the evidence, "must determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense." *State v. Olson*, 330 N.C. 557, 564, 411 S.E.2d 592, 595 (1992). A person is guilty of a second-degree sexual offense if he or she "engages in a sexual act with another person . . . [b]y force and against the will of the other person." N.C.G.S. § 14-27.5(a)(1) (1993).

In this case, Elizabeth testified that after defendant made her take a shower and douche at his parents' house, "he made [her] perform oral sex on him, but [she] gagged [her]self so he would let [her] stop. . . . He forced [her] head down and made [her] place [her] mouth around his penis, and then [she] proceeded to try and throw up." This

testimony constituted "relevant evidence that a reasonable mind might accept as adequate to support [the] conclusion," *Olson*, 330 N.C. at 564, 411 S.E.2d at 595 (defining substantial evidence), that defendant forced Elizabeth to engage in fellatio against her will. The court, therefore, did not err in denying defendant's motion to dismiss the charge of second-degree sexual offense.

. VI

**[6]** Defendant's final argument is that he "is entitled to a new sentencing hearing because the trial court erroneously found essentially a non-statutory aggravating factor of defendant's unrelated conduct during pretrial confinement and trial and of the especially destructive effect of his crimes on other women and on the fabric of society." Although the court discussed defendant's behavior as devastating upon Elizabeth, her parents and society and commented on how to protect women from brutal rape, the court also stated that it "would not attempt to speculate and will not sentence the defendant on speculation in that respect." The court went on to state that it considered only the evidence in sentencing defendant and took into account defendant's criminal history as an aggravating factor, his statement as a mitigating factor, and his identification of the codefendant at an early stage as a nonstatutory factor. The court's comments indicate it did not consider or apply defendant's disruptive conduct during pretrial confinement and trial and of the especially destructive effect of his crimes on Elizabeth, her parents, other women and on the fabric of society as nonstatutory factors in sentencing defendant. *Cf. State v. Shaw*, 106 N.C. App. 433, 442-43, 417 S.E.2d 262, 268-69 (where trial court's comments indicated he considered that victim is entitled to peace of mind and body in her home in imposing sentences greater than presumptive terms, such consideration is improper basis for increasing presumptive sentence, entitling defendant to new sentencing hearing), *disc. rev. denied*, 333 N.C. 170, 424 S.E.2d 914 (1992). Defendant, therefore, is not entitled to a new sentencing hearing.

Because defense counsel's closing argument is not transcribed in the record before this Court, we are precluded from addressing defendant's contention that "the trial court committed reversible error in sustaining an objection to defendant's closing argument regarding the mandatory life sentences defendant faced." *See State v. Moore*, 75 N.C. App. 543, 548, 331 S.E.2d 251, 254 ("[a]n appellate court cannot assume or speculate that there was prejudicial error when none appears on the record before it"), *disc. rev. denied*, 315

N.C. 188, 337 S.E.2d 862 (1985). For the reasons stated in this opinion, we find no prejudicial error.

No error.

Judges LEWIS and MARTIN, MARK D., concur.